**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CR-20178-CMA**

**UNITED STATES OF AMERICA**

**v.**

 **ROBERT SHAPIRO,**

                **Defendant.**
_____/


**THE UNITED STATES OF AMERICA'S AMENDED MOTION *IN LIMINE* TO PRECLUDE IRRELEVANT, CONFUSING, AND UNDULY PREJUDICIAL DEFENSES AND JURY NULLIFICATION ARGUMENT, AND FOR LEAVE TO SEAL THE COURTROOM DURING A LIMITED PORTION OF TRIAL TESTIMONY**

In advance of the jury trial of the defendant, Robert Shapiro ("Shapiro" or "Defendant Shapiro"), the United States of America hereby seeks an *in limine* ruling from the Court that references to the fact that the Defendant may be a cancer survivor; the Defendant's age/medical condition; and attacks upon prosecutorial discretion constitute impermissible jury nullification arguments, are unduly prejudicial, not proper bases for defenses, and will be prohibited. Similarly, the United States seeks to preclude confusing defenses in which Shapiro may seek to blame the Securities and Exchange Commission or bankruptcy trustee for investor losses, as they are not valid defenses to the charged crimes. Depending in part on the defenses asserted at trial, the government may need to put on the record certain confidential information concerning property valuation, which is the basis for the government's related request to potentially seal the courtroom during a limited portion of trial.[1] For the reasons below, the requested relief is warranted.

_____

[1]     This motion follows the Court's denial without prejudice (D.E. 93) of the government's motions *in limine* (D.E. 91 & 92). To the government's view, while filed under the "*in limine*" ECF event, a motion to seal the courtroom (D.E. 92) is a procedurally distinct motion from a

## I.     PROCEDURAL HISTORY

On April 4, 2019, a grand jury in the Southern District of Florida returned an indictment charging Defendants Shapiro, Dane Roseman a/k/a "Dayne Roseman" ("Roseman"), and Ivan Acevedo ("Acevedo") with one count of conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count 1); Shapiro and Acevedo with one count of mail fraud, in violation of Title 18, United States Code, Section 1341 (Count 2); Shapiro and Roseman with four additional counts of mail fraud, in violation of Title 18, United States Code, Section 1341 (Counts 3 through 6); Shapiro and Roseman with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 7 through 8); Shapiro with one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count 9); and Shapiro with one count of evasion of payment of federal income taxes, in violation of Title 26, United States Code, Section 7201 (Count 10).  *See* D.E. 3, 11.

On June 3, 2019, at a calendar call, the Court set co-defendants Roseman and Acevedo for trial in February 2020.  Trial in Defendant Shapiro's case was subsequently scheduled to begin with jury selection on August 5, 2019.  D.E. 79.

## II.    FACTUAL BACKGROUND[2]

### a.   The Fraud Scheme and Money Laundering Activities

For more than five years, Defendant Shapiro spearheaded a $1.3 billion *Ponzi* scheme

---

motion *in limine*.  Cognizant of the Court's limit upon motions *in limine*, however, the government hereby refiles its motions (D.E. 91 & 92) as a single consolidated motion, as there are related issues and facts involved, and respectfully requests that its prior sealed memorandum of law be incorporated by reference.  In the alternative, the government requests leave for an extension of the motion deadline, and specific permission to raise the issue of sealing the courtroom through briefing at trial, if the need arises.

[2]     The United States proffers these facts based upon anticipated evidence to be presented as part of its case-in-chief, for the limited purpose of assisting the Court in deciding pretrial motions.

through a network of entities, including Woodbridge Group of Companies, LLC (collectively, "Woodbridge"), that involved the sale of securities to more than 8,000 people. Woodbridge employed approximately 130 people in offices in six states, the first of which was in Boca Raton. At all times, Shapiro was Woodbridge's owner, President, and CEO, and maintained control over the company and its affiliates.

The fraud scheme ran from July 2012, through December 4, 2017, when Woodbridge filed for Chapter 11 bankruptcy and defaulted on its obligations to investors. The scheme was massive in terms of its financial magnitude, duration, and the volume of victims, many of whom are elderly and dispersed across the country. For years, Defendant Shapiro and his co-conspirators, including co-defendants Roseman and Acevedo, made material misrepresentations and used high-pressure sales tactics to trick victims into investing their funds. Woodbridge claimed, primarily, to offer investors opportunities to make money by helping to fund real estate loans.

Woodbridge mainly promoted two types of products during the scheme: the first position commercial mortgage ("FPCM") and private placement fund offerings ("Fund Offerings"). Regarding the FPCM, Woodbridge promised investors five to eight percent annual interest, paid monthly, with a return of their principal after 12 to 18 months, and assigned each a pro-rata first position interest in the underlying property. Based on Woodbridge's lies and omissions, the victims believed that their money would be used to finance mortgages to third-party property owners, and that third parties would be making interest payments to Woodbridge; they were also made to believe that real estate assets secured their investments, and at minimum, that Woodbridge's real estate dealings would generate the funds used to pay the return on their investments. Misleading marketing materials were disseminated online, as well as to external sales agents, who, instead of acting independently, pitched investors in return for commissions from

Woodbridge.  Below is one such example of Woodbridge's marketing material:



With regard to the Fund Offerings, Woodbridge purportedly limited these investments to accredited investors with a $50,000 minimum subscription, and provided for a five-year term with a six to ten percent aggregate annual return paid monthly, and a two percent "accrued preferred dividend."  Woodbridge represented to investors that their funds would be used, and their returns would be generated by, real estate acquisitions and investments, notably including Woodbridge's FPCMs.  In effect, the Fund Offerings were investments into pooled FPCMs.  Shapiro demanded that Roseman and the internal sales team seek to move FPCM investors into the Fund Offerings.

In reality, Woodbridge used investor funds to pay Shapiro and entities he controlled; concealed the fact that Shapiro, not third parties, controlled the vast majority of the properties; concealed the fact that the advertised business models were not profitable; and kept the scheme going with *Ponzi* payments, *i.e.*, by using new investors' money to pay off the old investors.

The crime was borne of greed.  As a result of the Woodbridge fraud scheme, Shapiro received

approximately $36 million in investor funds, far more than any of his co-conspirators. He used millions of dollars to, among other things, pay for private air travel throughout the world, including France, Spain, Portugal, Italy, England, Ireland, French Polynesia, Australia, Israel, New Zealand, and Mexico; purchase valuable artwork; purchase high-end jewelry; make payments on luxury vehicles; finance home remodeling; and donate to political causes. Some of Shapiro's personal expenditures were directly paid for from corporate accounts, while other items were purchased through his wife's credit cards, and then Woodbridge investor funds were used to pay off the credit card debts. Indeed, Shapiro used accounts held the name of his wife and his wife's entities to aid him in laundering investor funds.

Shapiro went to great lengths to keep the fraud – and his profits – going, even in the face of hurdles such as regulatory and enforcement actions. An example of this is anticipated testimony and evidence that, during the scheme, Shapiro violated an emergency cease-and-desist order issued by the Securities Commissioner for the State of Texas by (1) offering to make "under-the-table" payments in untraceable gold coins to salespeople who agreed to continue soliciting investors regardless of the cease-and-desist order; and (2) arranging for certain salespeople to receive investor money through intermediary Regulation D corporations instead of having investor money sent directly to Woodbridge.

Indeed, it was not just in Texas that Woodbridge had been ordered to halt its activities. During the course of the conspiracy, at least five states, including Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, issued cease and desist orders against one or more of the Woodbridge entities based on their unregistered sale of securities. Shapiro and his co-conspirators nonetheless continued to sell their investment products to residents of those states, and engaged in deceptive conduct with respect to pending state regulatory actions against Woodbridge. Shapiro instructed Roseman to affirmatively withhold Woodbridge's state regulatory problems from investors, and to only tell investors in the event that they ask. Furthermore, Shapiro, Roseman, and their co-conspirators mischaracterized the dispositions of these regulatory actions to the external sales

5

agents, who assisted Woodbridge in pushing its business to investors, and the investors themselves, by claiming that Woodbridge had been "exonerated" of wrongdoing by the states, when no such determination was actually made.

Towards the end of the conspiracy, Shapiro, Roseman, and their co-conspirators began transitioning investors into a new Woodbridge product called a Co-Lending Opportunity ("CLO"). The CLO mirrored the FPCM in every material respect save one—the CLO's term was for nine months. In email communications, Shapiro and Roseman contended that Woodbridge could circumvent some states' regulatory agencies by moving investors from the FPCM and Fund Offerings to the CLO, and planned to "switch first then settle quietly" with the states that issued cease and desist orders.

Beginning in the summer of 2017, Shapiro began exploring the possibility of filing for bankruptcy. However, Shapiro and his co-conspirators continued advertising investments for FPCM, Fund Offerings and CLOs through all mediums, and continued to accept investor money without disclosing that Woodbridge was insolvent and on the verge of bankruptcy. Woodbridge received more than $52 million of investor money from October 2017 through the filing of its bankruptcy on December 4, 2017.

The U.S. Securities and Exchange Commission ("SEC") conducted a parallel investigation and, in December 2017, filed an emergency action for relief, shortly after Woodbridge declared bankruptcy. In the SEC matter, District Court Judge Marcia G. Cooke issued an asset freeze order directed at Shapiro and his associates ordering them to stop using investor money. *See United States v. Shapiro, et al.*, Case No. 1:17-CV-24624-MGC, Order Granting Emergency Ex Parte Motion for Asset Freeze and Other Relief (D.E. 13) (S.D. Fla. Dec. 20, 2017). The government also anticipates that it will introduce evidence at trial that Defendant Shapiro also obstructed the SEC's investigation into his company's dealings by instructing subordinates to direct Woodbridge's salespeople not to

6

provide statements to the SEC.  In addition, immediately prior to the asset freeze and Woodbridge's bankruptcy filing, Shapiro diverted millions of dollars to several bank accounts opened in the name of his wife.  Shapiro appears to have been using this money – which includes funds traceable to Woodbridge's victim investors – to fund new business ventures, including companies called "Commercial Bridge Lenders, LLC" and "Lionshare Lending, LLC."

  **b.  <u>Shapiro's Tax Evasion</u>**

  Shapiro is also charged with willfully attempting to evade and defeat payment of income tax due and owing to the United States for calendar (tax) years 2000 through 2005, with total tax due and owing in excess of six million dollars.  Count 10 of the indictment alleges that Shapiro's evasion began in or around January 2002 and continued through present day, and it lists five affirmative acts: (a) filing false and fraudulent individual income tax returns (IRS Form 1040s), in which he understated his income; (b) creating RS Trust in the State of Nevada on or about June 25, 2013, to conceal his assets and income; (c) transferring approximately $60,537,176 from RS Trust to nominee accounts controlled by him; (d) creating and using nominee accounts to pay personal expenses totaling approximately $27,331,075, including the purchase and renovation of his home, luxury airline travel, wine, entertainment, luxury vehicles, and jewelry; and (e) filing a false and fraudulent IRS Form 656-L, "Offer in Compromise (Doubt As To Liability)," with the IRS in Plantation Florida, on or about March 13, 2017, wherein he lied about his physical home address on the signed form under penalty of perjury, and claimed that he lived at a location worth substantially less than the approximately $6.7 million dollar property in which he resided.  D.E. 3.

  Shapiro's income tax returns for 2000 through 2005 failed to accurately disclose his income.  He significantly underreported income, and for tax years 2001 through 2003, showed $0 in taxes due and owing.  He in part corrected what he had reported, and has made some payments; yet has still failed to pay the vast majority of taxes due and owing.

Over the years, Shapiro also attempted to contest the amounts that he owed through civil tax litigation, but did not prevail.  In 2008, the IRS issued a summons and filed tax liens.  Shapiro, through his attorneys, mounted challenges to the IRS's collection efforts, including by filing multiple petitions in United States Tax Court from 2008 through 2010, and submitting requests to the IRS for settlement offers.  Even in this part of the process, Shapiro misrepresented or failed to accurately disclose assets and income.  For example, in 2010, Shapiro's power of attorney provided an unsigned Form 433-A (Collection Information Statement) as part of a collection due process request.  Yet, Shapiro did not report properties, investments, or cars on the form, and ultimately, his representative told the IRS that Shapiro was unwilling to turn over signed financial disclosures.

Of particular relevance to the instant motion, Shapiro previously argued that he should not have to pay tax penalties or interest on amounts due and owing, and that he should receive an abatement: (1) because of statute of limitations arguments as to tax years 2000 through 2002; and (2) because of his medical condition, specifically, suffering and then recovering from cancer (Hodgkin's Lymphoma) for tax years 2003 to 2005.  That request did not succeed.

Despite his knowledge of his outstanding tax liability, Shapiro continued to evade payment of the taxes due and owing by creating the RS Protection Trust in 2013; shielding assets; and including misleading or false information, or declining to report financial information, to the IRS. Ultimately, the IRS placed a lien on his $6.7 million home, 4030 Longridge, in 2017, and Shapiro offered to settle with the IRS; but the settlement fell apart when again, Shapiro refused to complete a Form 433-A which called for complete disclosure of his assets and finances.

## III.   ARGUMENT

Defendant Shapiro should be barred from presenting nullification theories and irrelevant, confusing arguments or evidence to the jury.  "Nullification is, by definition, a violation of a juror's

oath to apply the law as instructed by the court – in the words of the standard oath administered to jurors in the federal courts, to 'render a true verdict according to the law and the evidence.'" *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (citation omitted; emphasis in original). The Eleventh Circuit has unequivocally disapproved of the practice and has issued clear instructions that "defense counsel may not argue jury nullification in closing argument." *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983); *see United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) (collecting cases in support of proposition that a defendant has no right to make arguments geared towards nullification). Because "trial courts have the duty to forestall or prevent such conduct," *Thomas*, 116 F.3d at 616, the Government moves to exclude evidence and to preclude argument, commentary, and questioning of witnesses designed to convince the jury to acquit not because the government failed to prove the charged crimes, but rather because a guilty verdict would be contrary to one's sense of justice, morality, or fairness. *United States v. Edwards*, 303 F.3d 606, 633 n.15 (5th Cir. 2002); s*ee also Washington v. Watkins*, 655 F.2d 1346, 1374 (5th Cir. 1981); *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming trial court's refusal to admit evidence bearing no legal relation to the charges but which might encourage a "conscience verdict" of acquittal); *United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) ("[D]efendants are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.").

### a. Confusing, Unduly Prejudicial, and Irrelevant Defenses, Such As Arguments Based on Shapiro's Medical History, Should Be Precluded from Trial.

Pursuant to Rules 401 and 403 of the Federal Rules of Evidence, this Court should bar Shapiro from raising irrelevant, potentially confusing and unduly prejudicial excuses for his crimes from trial, as they are not a proper defense to the charges in the indictment. Shapiro's arguments regarding his possible history of cancer/medical conditions and the statute of limitations, made by

his attorney to the IRS, are legally meritless, and cannot absolve him of tax liability; thus, he should be barred from re-raising them here.  Nor do Shapiro's cancer history and medical conditions have any bearing upon whether he committed the charged fraud and money laundering offenses.

In particular, the government seeks to preclude argument, commentary, statements or testimony regarding Shapiro's possible history of cancer and being a cancer survivor, as there is a risk that it will (1) confuse the jury, since it is not a legally valid excuse for fraud, avoiding tax payments, or failing to accurately report income and assets; and (2) encourage nullification, as reference to Shapiro's cancer would only be meant to tug at the jury's heartstrings, and gather sympathy.  The idea that cancer would only affect Shapiro's ability to accurately report or repay his income, but not his ability to earn and spend substantial sums of undisclosed income, is also an illogical one.  *Cf. United States v. Terry*, No. 1:10-CR-390, 2011 WL 2149361, at *6 (N.D. Ohio May 31, 2011) (granting motion to preclude evidence that would be "unfairly prejudicial to the government because it may confuse the jury by leading them to believe that any possible fraud was harmless because the decisions would have been the same with or without the alleged bribery.").  Put differently, it is simply not relevant, under Rule 401, whether Shapiro had cancer or not, as it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Remarks regarding Shapiro's age and medical condition can likewise be interpreted as nothing other than a naked attempt to persuade the jury to make a decision based on something other than the evidence presented at trial, and should be independently barred under Rule 403's balancing test to the extent that the Court deems them relevant.  *United States v. Baker*, No. 18-1663, 2019 WL 2246549, at *5 (3d Cir. May 24, 2019) (affirming district court's decision to

preclude, under Rules 401 and 403, defendant's wife's testimony regarding her breast cancer and medical expenses, which defendant attempted to offer as part of his defense in an embezzlement of public funds, as "evidence of [his] lack of intent to permanently deprive the government of its property" or to rebut "the false impression that he had stolen money to improve his property[,]" an impression he feared was created by the government's introduction of pictures of his house"; the court ruled such evidence was not relevant, not a defense to the charges, and unduly prejudicial); *see also LaFarge v. Kyker*, No. 08-CV-185-SA-JAD, 2011 WL 13157187, at *2 (N.D. Miss. May 10, 2011) (granting motion to preclude similar evidence in civil case, holding that "[t]he fact that Plaintiff at one time had breast cancer has little or no probative value to this case and, any probative value it may contain, is greatly outweighed by the prejudice that would certainly result.").

### b. Defenses Casting Blame for Investor Losses on the SEC or Bankruptcy Trustee Are Not Proper Defenses to the Charged Crimes.

The United States further anticipates that Shapiro may attempt to argue that the Woodbridge business model would have made money in the longer term, but for the SEC action and the bankruptcy, and that Shapiro, in his heart of hearts, believed this. It is no defense to the charged crimes to blame the bankruptcy trustee and/or SEC for causing investor losses, rather than Shapiro and Woodbridge, and thus this defense should also be kept out of the trial pursuant to Rule 403, as it would create undue confusion. Even if Shapiro did believe the business would make money in the long run, that is not a proper defense to this conspiracy and fraud scheme, in which Shapiro and his co-conspirators made material misrepresentations to investors for years, to trick them into providing funds that were used for their personal benefit, and to repay older investors. In a similar vein, attacks upon the bankruptcy trustee for failing to sell Woodbridge properties or maximize their value *after* the *Ponzi* scheme collapsed may be a feature of the defense. Any such attacks would likewise be irrelevant to the charged crimes, and not a defense to the massive fraud

11

helmed by Shapiro and operation of the *Ponzi* scheme in effect prior to the bankruptcy.

### c.  The Court Should Seal the Courtroom During Any Valuation Testimony.

Particularly if the above-described defense is permitted, and perhaps even if it is not, it may be necessary to seek leave of the Court to seal the courtroom during the testimony of anticipated government witness Frederick Chin, the bankruptcy trustee.[3]   Mr. Chin would testify as to confidential valuation of certain properties that are part of the bankruptcy estate, which were formerly held by Woodbridge.  This anticipated testimony will rebut any defense arguments about the value of the properties and rebut the notion that the SEC proceeding and bankruptcy action, rather than the fraud scheme, are to blame for investor losses.  There is good cause to seal this limited portion of testimony, should it become relevant at trial, because it may harm the ability of the bankruptcy creditors – *i.e. Ponzi* scheme victims – to maximize their recovery, given that asset sales are ongoing.   This valuation information is currently confidential, as ordered by the Bankruptcy Court, and there is no reason to believe that it will otherwise become public.  *See* 17-bk-12560-KJC (Bankr. D. Del.) (D.E. 2880) (ordering that "The Confidential Exhibit shall not be made available to anyone, except to the Court, the U.S. Trustee, counsel to the Committee, counsel to the Noteholder Group, counsel to the Unitholder Group, any governmental agency upon request of such agency, and other parties as otherwise ordered or required by the Court"; and that "Any subsequent pleadings that attach the Confidential Exhibit *or make reference to the information contained therein* shall also be filed under seal and/or redacted to preserve the confidentiality of

---

[3]      Specifically, if necessary, the government would seek permission to seal the courtroom during a portion of the testimony of anticipated government witness Frederick Chin, except as to: (1) the United States Attorney's Office and Department of Justice personnel; (2) law enforcement officers involved in the investigation of this matter; (3) counsel of record for the defendant; (4) the defendant; (5) defense counsel's staff or investigators to the extent that defense counsel determines disclosure is necessary to assist in his representation; and (6) the jury and courtroom personnel.

such information." (emphasis added)).  Thus, this relief may be warranted at trial.

> **d.  Jury Nullification Argument, Statements, and Questioning Should Be Barred.**

Finally, additional improper arguments and statements would include, for example, suggestions that the prosecution is unfair: (1) because it was brought in conjunction with SEC or a bankruptcy proceeding; (2) because Shapiro has already been civilly sanctioned; (3) because the case was brought despite Shapiro's age and physical condition, including his past cancer; or (4) because the government has chosen to prosecute Shapiro, but not others who may also be culpable of the same conduct, be it tax evasion, other *Ponzi* schemes, or this exact scheme.  *See, e.g.*, *Lucero*, 895 F. Supp. at 1426; *United States v. Maxwell*, No. 05-20571-CR, 2006 WL 8439795, at *5 (S.D. Fla. Oct. 4, 2006) (granting similar relief in contract fraud case; "[t]he Government's failure to prosecute others engaged in similar misconduct is not a defense on the merits of the criminal charges against Defendant and therefore evidence regarding the failure to prosecute other contractors may be not be introduced, nor may such arguments be made to the jury.").

In addition, the government's financial analysis and investigation revealed that Shapiro donated funds derived from Woodbridge investors to certain Republican politicians and political causes.  Any suggestion that this prosecution was brought because of Shapiro's political affiliation or donations to Republican political causes – through argument, questioning, or otherwise – would also be impermissible as (1) such argument could only be designed to inflame the jury; and (2) Shapiro's possible political affiliation did not in any way serve as a basis for the prosecution.  The identity and quantity of individuals charged and the reasons behind those charging decisions are, categorically, examples of irrelevant and potentially confusing evidence aimed at jury nullification, or misleading the jury, which should be barred under Rule 403 of the Federal Rules of Evidence.  *United States v. Re*, 401 F.3d 828, 832 (7th Cir. 2005) (government's exercise of

prosecutorial discretion is not proper subject for cross-examination); *United States v. Boyle*, No. S1 08 CR 523 (CM), 2009 WL 5178525, at *3 (S.D.N.Y. Dec. 23, 2009) (holding that evidence related to the government's charging decisions may be excluded from trial as irrelevant; this is distinct from evidence of third-party guilt for the charged crimes).

Accordingly, the Defendant should be precluded from making arguments or comments to the jury, and from eliciting statements on cross-examination, that are irrelevant to the record evidence and crimes charged and that are, instead, designed to encourage a verdict in disregard of the law. In addition, the government should be permitted to seek sealing of the courtroom during trial, should the need arise for testimony concerning confidential valuation of certain properties that are part of the bankruptcy estate.

## CERTIFICATE PURSUANT TO LOCAL RULE 88.9

Pursuant to Local Rule 88.9, the government contacted defense counsel by email on June 27, 2019. Ryan O'Quinn, counsel for Shapiro, indicated that he opposes the instant motion.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court grant the relief sought herein.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:  s/ Lisa H. Miller
     LISA H. MILLER
     Court ID No. A5502054
     ROGER CRUZ
     Assistant United States Attorneys
     99 N.E. 4th Street
     Miami, FL 33132
     Telephone: (305) 961-9312
     Facsimile: (305) 536-4699
     Email: lisa.miller@usdoj.gov