UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20178-CR-CMA

UNITED STATES OF AMERICA

v.

ROBERT SHAPIRO,

        **Defendant.**
_____/

### STIPULATED FACTUAL PROFFER

Were this case to proceed to trial, the defendant, Robert Shapiro ("SHAPIRO" or the "Defendant") and the United States of America agree that the Government would prove the following facts beyond a reasonable doubt. The parties agree that the following facts are true and are not all of the facts known to the parties regarding this matter.

**I.**    **Offense Conduct: Count 1 (Conspiracy to Commit Mail Fraud and Wire Fraud)**

SHAPIRO admits that, from in or around July 2012, through in or around December 2017, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, he did willfully conspire with others to knowingly and with the intent to defraud, devise, and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly cause to be delivered certain mail matter and did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain writings, signs, signals, pictures, in violation of 18 U.S.C. §§ 1341 and 1343; all in violation



of 18 U.S.C. § 1349.

The purpose of the conspiracy was for SHAPIRO and his co-conspirators to defraud investors and obtain money and property by materially false and fraudulent pretenses, representations, and promises in connection with the sale of promissory notes and units, by: (a) soliciting and causing others to solicit millions of dollars in investor funds under false and fraudulent pretenses, representations and promises; (b) intentionally failing to utilize investor funds and assets in the manner that they, their co-conspirators and others had promised; (c) misappropriating and converting investor funds for their own benefit and the benefit of others without the knowledge and authorization of the investors; and (d) making false statements and engaging in other fraudulent activities designed to conceal the commission of the offense.

Defendant SHAPIRO was the owner, president, and chief executive officer of Woodbridge.[1] Through the RS Trust, which was controlled by SHAPIRO, he created a network



---

1    As used herein, "Woodbridge" collectively refers to all of the below entities.

    1.    Woodbridge Group of Companies, LLC (d/b/a Woodbridge Wealth) (the "Woodbridge Group of Companies") was a Sherman Oaks, California-based financial services company formed in 2014.

    2.    Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC (collectively, "Woodbridge Fund Companies") were Delaware companies formed between 2010 and 2015, all of which were created to act on behalf of Woodbridge.

    3.    WMF Management, LLC ("WMF") was a California company formed in 2012 and created to act on behalf of Woodbridge.

    4.    Woodbridge Structured Funding, LLC, a/k/a Woodbridge Structured Funding of Florida, LLC, ("WSF") was a Delaware company formed in 2009 and created to act on behalf of

2

of more than 270 limited liability companies (the "RS Trust LLCs") that were used to further the fraud, as well as to mask SHAPIRO's role in it. At all times during the conspiracy, SHAPIRO controlled Woodbridge and the RS Trust LLCs' bank accounts and corporate management, and was the sole signatory on all of Woodbridge's bank accounts. SHAPIRO signed thousands of checks to investors and employees, as well as to external and internal sales agents, and personally directed transfers of payments to and from Woodbridge's accounts. In addition to the Woodbridge entities and RS Trust LLCs, SHAPIRO established and controlled additional corporate entities in the name of his wife, J.S., and at SHAPIRO's direction his wife established bank accounts for those entities. These entities included: 3X A Charm LLC; Archway Masters Construction LLC; Beeman Studio City LLC; Carbondale Basalt Owners LLC; Carbondale Primrose Ventures; Commercial Bridge Lending; Davana Primrose Ventures LLC; Davana Sherman Oaks Owners LLC; 204 Derby Ave LLC; Direct Insurance Source LLC; In Trend Staging LLC; Golden Mesa Ventures LLC; Golden Primrose Ventures LLC; JS Family Trust; Mesa Glen Enterprises LLC; Midland Loop Enterprises LLC; Moorpark Boca Funding LLC; Reliance Marketing Solutions

---

Woodbridge.

5.    Woodbridge Realty of Colorado ("Woodbridge Realty") was a Colorado company formed in 2014 and created to act on behalf of Woodbridge.

6.    Mercer Vine, Inc. ("Mercer Vine") was a California corporation formed in 2014 and created to act on behalf of Woodbridge.

7.    Riverdale Funding, LLC ("Riverdale") was a Delaware corporation formed in 2012 and created to act on behalf of Woodbridge.

8.    RS Protection Trust ("RS Trust") was created under Nevada law in 2013 and served as a holding trust for the assets of Woodbridge, WMF, WSF, and approximately two-hundred and seventy-two (272) other Woodbridge associated Delaware and Colorado companies.

LLC; Riverdale Funding LLC; Schwartz Media Buying Company LLC; Seaview Moorpark Real Estate Investment LLC; Settlement Depot LLC; Summit Sherman Oaks LLC; and Stover Real Estate Partners LLC. SHAPIRO also used the accounts established in these entities' names, as well as in J.S.'s name, for his own use and benefit.

SHAPIRO supervised and managed all of the employees at Woodbridge including, but not limited to, co-conspirators who worked at Woodbridge. SHAPIRO set and approved employee salaries, oversaw employee hiring and firing, and was the sole chief executive responsible for Woodbridge.

SHAPIRO and his co-conspirators created various Woodbridge investment opportunities in order to raise money. During the conspiracy, SHAPIRO and his co-conspirators, through Woodbridge, primarily sold two types of investments to investors: (a) short-term promissory notes that purportedly paid investors monthly interest that Woodbridge described as a First Position Commercial Mortgage ("FPCM"); and (b) unit offerings with five-year terms ("Fund Offerings") that were sold to investors that also falsely and fraudulently claimed to pay investors interest payments. SHAPIRO and his co-conspirators misleadingly claimed that these investments were adequately secured by real property owned by third-party borrowers, and thus safe.

From in or around August 2012 through in or around December 2017, Woodbridge raised approximately $1.29 billion from approximately 10,000 investors across the United States. Woodbridge solicited these investors, and promoted investments in FPCM and Fund Offerings, at SHAPIRO's direction, through various means, including telemarketing; a nationwide network of hundreds of external sales agents; radio, television, and newspaper advertisements; social media; websites; and conferences. Woodbridge, at SHAPIRO's direction, instructed investors to make

4

payments for the investments by: (a) transferring funds electronically via interstate wires to bank accounts SHAPIRO controlled; or (b) mailing checks to Woodbridge's corporate offices.

SHAPIRO approved, and agreed to pay, commissions to internal sales employees and external sales agents based upon the volume of sales of the aforementioned investments. Indeed, SHAPIRO authorized payment of more than $80 million in commissions to sales agents who sold Woodbridge investments. These commissions were funded by investor money. SHAPIRO also personally spoke and met with certain investors in order to encourage them to place their funds with Woodbridge. Marketing materials, statements of former Woodbridge employees, and investors' statements establish that the sales pitches made by external sales agents, internal sales agents, and in advertising campaigns were consistent with SHAPIRO's sales pitches to investors.

SHAPIRO and his co-conspirators caused Woodbridge to raise money through the FCPM and Fund Offerings marketed to investors under the false premise that Woodbridge's funds would be used to make secured loans to third-party borrowers at favorable loan-to-value ratios, with such third-party borrowers being required to make regular monthly interest payments to Woodbridge's investors. For example, SHAPIRO and his co-conspirators, through Woodbridge, mislead investors by representing that: (a) Woodbridge's successful acquisition, development, and management of real estate generated sufficient profits to pay the interest rate Woodbridge promised to investors; (b) investors would have a "first-position" on the real property serving as collateral on the loan; and (c) the third-party borrowers were bona-fide commercial property owners who could not obtain traditional loans and were willing to pay Woodbridge higher interest rates for short-term financing.



In reality, SHAPIRO caused Woodbridge to purchase real properties through the RS Trust

and other entities that he controlled, and his co-conspirators failed to disclose to investors that he controlled the vast majority of these properties. Contrary to representations to investors, SHAPIRO's real estate portfolio failed to generate sufficient cash flow, so the SHAPIRO-controlled properties were unable to satisfy the loan obligations and interest payments owed to Woodbridge and its investors. To make up for the cash deficiency and without disclosing the material risks associated with that growing deficiency, SHAPIRO diverted recently collected investors' funds to pay purported profits to prior investors. As a result of this improper diversion, hundreds of millions of dollars invested by new investors were misused to pay false and misleading "returns" to existing Woodbridge investors. Furthermore, particularly toward the end of the scheme, because Woodbridge's investors overwhelmingly loaned money to RS Trust LLCs and Woodbridge entities with no ability to pay interest or generate income, the amount of money Woodbridge generated paled in comparison to the amount they took in from investors.

SHAPIRO made payments of "interest" to existing investors, without regard to the performance of the investors' respective investment. For example, on certain occasions, SHAPIRO issued notes in respect to properties that Woodbridge never actually acquired, including properties at 778 Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn. Nevertheless, investments were solicited from investors, and liens and security interests were purportedly granted to the Woodbridge Funds, to secure "loans" relating to such properties.

SHAPIRO diverted, and caused to be diverted, investor funds to other companies and nominee accounts that he and J.S. controlled and used investor funds to pay credit card accounts held in nominees' names for his personal use and benefit. SHAPIRO misappropriated at least approximately $25 million to $95 million in Woodbridge investor funds to himself and his

6

immediate family members. For example, SHAPIRO personally authorized diversion of more than $20 million from Woodbridge bank accounts to various credit card accounts held in the name of his wife, J.S. SHAPIRO used these accounts and credit cards to charge personal expenses, including extravagant travel, art, and luxury furnishings. Through this process, SHAPIRO misappropriated millions of dollars from Woodbridge investors.

During the course of the conspiracy, at least five states, including Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, issued cease and desist orders against one or more of the Woodbridge entities based on their unregistered sale of securities. SHAPIRO and his co-conspirators nonetheless continued to sell their investment products to residents of those states, and engaged in deceptive conduct with respect to pending state regulatory actions against Woodbridge, in violation of the cease and desist orders.

At some point in 2017, SHAPIRO made the decision that Woodbridge would be filing for bankruptcy. Without disclosing to investors that Woodbridge was insolvent and on the verge of bankruptcy, Shapiro caused Woodbridge to collect additional money from investors through the filing of Woodbridge's bankruptcy in December 2017.

Immediately prior to Woodbridge's bankruptcy filing, SHAPIRO diverted millions of dollars to several bank accounts opened in the name of his wife, J.S. SHAPIRO used this money – which included funds traceable to Woodbridge's victim investors – to fund new business ventures, including companies called "Commercial Bridge Lenders, LLC" and "Lionshare Lending, LLC," which he continued to operate for his personal use and benefit.

In total, as a result of his criminal conduct at Woodbridge, SHAPIRO and his co-conspirators convinced more than approximately 9,000 investors to invest more than $1.29 billion in Woodbridge. As a result of the fraud, most of Woodbridge's investors lost money, with total

losses likely to exceed at least one hundred million dollars.

### II. Offense Conduct: Count 10 (Evasion of Payment of Federal Income Taxes)

From in or around January 2002 through the present, in Broward County, in the Southern District of Florida, and elsewhere, **SHAPIRO** willfully attempted to evade and defeat the payment of income tax due and owing by him to the United States of America, for the calendar years 2000, 2001, 2002, 2003, 2004, 2005, with total tax due and owing of at least approximately $6,061,134. SHAPIRO acknowledges and agrees that he evaded payment of income tax due and owing by committing the following affirmative acts, among others: (a) filing false and fraudulent IRS Forms 1040, U.S. Individual Income Tax Returns, with the IRS understating his total income and tax due and owing; (b) creating RS Trust in the State of Nevada on or about June 25, 2013, to conceal his assets and income; (c) transferring approximately $60,537,176 from RS Trust to nominee bank accounts controlled by him; (d) creating and using nominee owner bank accounts to pay personal expenses totaling more than approximately $27,331,075, including the purchase and renovation of his home, luxury airline travel, wine, entertainment, luxury vehicles, and jewelry; and (e) filing a false and fraudulent IRS Form 656-L, "Offer in Compromise (Doubt As To Liability)," with the IRS in Plantation Florida, on or about March 13, 2017, wherein he lied about his physical home address on the signed form under penalty of perjury.



SHAPIRO's income tax returns for 2000 through 2005 failed to accurately disclose his income. SHAPIRO significantly underreported income, and for tax years 2001 through 2003, showed $0 in taxes due and owing. SHAPIRO in part corrected what he had reported, and has made some payments; yet to this day still failed to pay the vast majority of taxes due and owing.

SHAPIRO admits that he was aware of his tax liability, including not only the taxes due

and owing, but also penalties, assessments, and interest due to the IRS, and willfully chose not to make payment to the IRS.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 8/6/19

By: _____
ROGER CRUZ
ASSISTANT UNITED STATES ATTORNEY

Date: 8/5/2019

By: _____
LISA H. MILLER
ASSISTANT UNITED STATES ATTORNEY

Date: 08/05/19

By: _____
RYAN DWIGHT O'QUINN, ESQ.
ELAN GERSHONI, ESQ.
ATTORNEYS FOR ROBERT SHAPIRO

Date: 05/05/19

By: _____
ROBERT SHAPIRO, DEFENDANT