# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 19-20178-CR-ALTONAGA/GOODMAN

UNITED STATES OF AMERICA,

v.

ROBERT SHAPIRO,

                    Defendant.

_____/

## DEFENDANT ROBERT SHAPIRO'S SENTENCING MEMORANDUM

## Table of Contents

Page

I.   Introduction ..............................................................................................................1

II.  Application of the Sentencing Framework. ........................................................6

    A.   Application of Sentencing Guidelines. ...................................................7

        1.   A downward departure is appropriate under application of Note 20(C). ....7

        2.   Mr. Shapiro's advanced age and poor health also warrant downward departures ..................................................................................12

        3.   Objection to PSR's application of the Loss Enhancement. .......................12

    B.   Grounds Exist for Deviating from the Guidelines ..................................13

        1.   "The history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)) ........................................................................................15

        2.   "The need for the sentence imposed . . . to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense" (18 U.S.C. § 3553(a)(2)(A)) ..............................................17

        3.   "The need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" (18 U.S.C. § 3553(a)(2)(B)). ......................................18

        4.   "The need for the sentence imposed . . . to protect the public from further crimes of the defendant." (18 U.S.C. § 3553(a)(2)(C)) ...........................20

        5.   "The need to provide the defendant with . . . medical care . . . in the most effective manner." (18 U.S.C. §3553(a)(2)(D)). .......................................22

        6.   "The kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." (18 U.S.C. § 3553(a)(4)) ..........24

        7.   "The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3553(a)(6)) ..............................................................................31

III. Facility. ..................................................................................................................32

CONCLUSION ..............................................................................................................32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bonds v. United States*,
  2015 U.S. Dist. LEXIS 123550 (M.D. Ala. 2015)....................................................31

*Gall v. United States*,
  552 U.S. 38 (2007)...................................................................................... *passim*

*Kimbrough v. United States*,
  552 U.S. 85 (2007)...................................................................................6, 25

*Nelson v. United States*,
  555 U.S. 350 (2009)..........................................................................................6

*Pepper v. United States*,
  131 S. Ct. 1229 (2011)......................................................................................6

*Rita v. United States*,
  551 U.S. 338, 364-65 (2007) ......................................................................15, 25

*United States v. Adelson*,
  441 F.Supp.2d 506 (S.D.N.Y. 2006)............................................................ *passim*

*United States v. Alatsas*,
  2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) ...........................................................23

*United States v. Anderson*,
  533 F.3d 623 (8th Cir. 2008) ...........................................................................18

*United States v. Baldwin*,
  774 F.3d 711 (11th Cir. 2014) ...........................................................................13

*United States v. Barbato*,
  2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002)...............................................23, 24

*United States v. Booker*,
  543 U.S. 220 (2005)................................................................................. *passim*

*United States v. Burks*,
  2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010) ........................................................23

*United States v. Campbell*,
  762 Fed. Appx. 877 (11th Cir. 2019)....................................................................21

i

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) (*en banc*) ...................................................................13

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) (Underhill, J., concurring).....................................1, 25

*United States v. Duhon*,
    440 F.3d 711 (5th Cir. 2006) ...................................................................................31

*United States v. Emmenegger*,
    329 F.Supp.2d 416 (S.D.N.Y. 2004).........................................................................2

*United States v. Gupta*,
    904 F.Supp.2d 349 (S.D.N.Y. 2012).............................................................1, 19, 25

*United States v. Hochfeld*,
    13-cr-00021 (S.D.N.Y. Aug. 5, 2013) .....................................................................30

*United States v. Hoffman*,
    710 F.3d 1228 (11th Cir. 2013) .................................................................................6

*United States v. Hunt*,
    459 F.3d 1180 (11th Cir. 2006) .................................................................................5

*United States v. Lauersen*,
    362 F.3d 160 (2d Cir. 2004).......................................................................................9

*United States v. Lenagh*,
    2009 WL 296999 (D. Neb. Feb. 6, 2009) ...............................................................26

*United States v. Livesay*,
    587 F.3d 1274 (11th Cir. 2009) ...............................................................................19

*United States v. Matchett*,
    802 F.3d 1185 (11th Cir. 2015) ...............................................................................13

*United States v. McFarlin*,
    535 F.3d 808 (8th Cir. 2008) ...................................................................................23

*United States v. Parris*,
    573 F.Supp.2d. 744 (E.D.N.Y. 2008) ...................................................5, 9, 14, 31

*United States v. Redemann*,
    295 F. Supp. 2d 887 (E.D. Wis. 2003)....................................................................18

*United States v. Samaras*,
    390 F. Supp. 2d 805 (E.D. Wis. 2005)....................................................................18

*United States v. Thompson*,
    218 Fed. App'x 413 (6th Cir. 2007) ...................................................................32

*United States v. Vigil*,
    476 F. Supp. 2d 1231 (D.N.M. 2007) .................................................................18

*United States v. Watts*,
    10-cr-00627 (E.D.N.Y. Apr. 24, 2014) ...............................................................30

*Williams v. New York*,
    337 U.S. 241 (1949) .............................................................................................7

**Statutes**

18 U.S.C. § 1349 .............................................................................................................5

18 U.S.C. § 3553(a) ................................................................................................. *passim*

18 U.S.C. § 3553(a)(1) ............................................................................................14, 15

18 U.S.C. § 3553(a)(1)(C) ...........................................................................................22

18 U.S.C. § 3553(a)(2)(A) ......................................................................................18, 20

18 U.S.C. § 3553(a)(2)(B) ...........................................................................................19

18 U.S.C. § 3553(a)(2)(C) ...........................................................................................20

18 U.S.C. §3553(a)(2)(D) ............................................................................................23

18 U.S.C. § 3553(a)(4) .................................................................................................24

18 U.S.C. § 3553(a)(6) .................................................................................................31

26 U.S.C. § 7201 ............................................................................................................5

28 U.S.C. § 911(b)(2) ...................................................................................................24

28 U.S.C. § 991(b)(1)(A) .............................................................................................24

28 U.S.C. § 991(b)(1)(C) .............................................................................................24

28 U.S.C. § 994(m) .......................................................................................................24

28 U.S.C. § 994(o) ........................................................................................................24

28 U.S.C. § 995(13) ......................................................................................................24

28 U.S.C. § 995(15) ......................................................................................................24

28 U.S.C. § 995(16) ..................................................................................................24

Sentencing Reform Act of 1984 ..............................................................................24

USSG, ch. 1, intro., pt. 4(d) (1987)..........................................................................28

USSG § 5H1.1 ..........................................................................................................21

USSG §5H1.4 ...........................................................................................................23

Defendant Robert Shapiro, through undersigned counsel, submits this Sentencing Memorandum to aid the Court in its determination of the sentence to be imposed on Mr. Shapiro and states:

## I.    INTRODUCTION

In many cases, the Sentencing Guidelines serve as an effective tool to carry out the purposes of sentencing, bringing much-needed consistency and fairness to the challenging process of determining how to punish diverse individuals convicted of dissimilar offenses.  But like any system designed to homogenize disparate dimensions, unintended consequences occur. And so they have in this case, where, as a result of the government's unblinking devotion to the Guidelines - even the face of controlling adverse precedent and common sense - Mr. Shapiro faces a substantially harsher sentence for his fraudulent scheme than he would have had he committed armed bank robbery, aircraft piracy, horrific sexual abuse against a child, or even murder.

The incongruous outcome the government implicitly urges here stems almost entirely from one root: application of the loss enhancement contained in §2B1.1 of the Sentencing Guidelines (the "**Guidelines**") promulgated by the United States Sentencing Commission (the "**Commission**").  Before and after the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005), this provision has frequently drawn scorn from courts, particularly in high-loss cases. *See, e.g., United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) ("The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases . . .") (Underhill, J., concurring); *United States v. Gupta*, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012) (noting that "[b]y making a Guidelines sentence turn, for all practical purposes, on [the loss] factor, the . . . Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, . . . and, by contrast, effectively guaranteed that many such sentences would be irrational on their face"); *United States v. Adelson*, 441 F.Supp.2d 506,

509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (finding that the Guidelines place excessive weight on loss as a single factor, and noting that "[i]n many cases, . . . the amount . . . is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

These judicially expressed concerns cannot be explained away as isolated pockets of dissent raging against a system otherwise universally recognized to be sound.  To the contrary, even the Sentencing Commission itself recently acknowledged that the Guidelines may not be adequately structured for application to high-loss cases.   In announcing the results of the Commission's study of draft amendments to §2B1.1, its chair noted that that research

> has led us to believe that the fraud guideline may not be fundamentally broken for most forms of fraud. [Economic crime] sentences on average hew fairly closely to the guidelines *for all but the highest dollar values, over $1 million in loss.*

Chief Judge Patti B. Saris, Chair, U.S. Sentencing Commission, Remarks for Public Meeting of USSC (Jan. 9, 2015);[1] *see also,* U.S. Sentencing Commission, Press Release, April 9, 2015,[2] ("We found through comprehensive examination that the fraud guideline provides an anchoring effect in the vast majority of cases, *but there were some problem areas, particularly at the high-end of the loss table*") (emphasis added).   The demonstratives prepared by the Commission reflect those concerns, including one which tracks the disparity between Guideline range minimums and average sentences actually imposed, at all levels of the loss table.  That graph

---

[1]      Available    at    http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf (emphasis added).
[2] Available at https://www.ussc.gov/about/news/press-releases/april-9-2015

— which depicts sentencing judges' consistent rejection of the approach the government sponsors here — is reproduced below:



As the graph demonstrates, judicial concern about the application of the Guidelines to high-loss cases is widespread.  Indeed, the disparity between Guideline minimums and average sentences actually issued diverge precipitously as loss increases.  In order to put some flesh on the bones of this problem, the defense has prepared a lengthy and detailed chart which itemizes the sentences imposed by over twenty-five courts who have rejected the Guidelines and imposed sentences lower than the government advocates here for fraudulent schemes causing equivalent or, in many cases, far greater losses (some greater by a magnitude of many multiples).  A copy of the chart is attached hereto as **Exhibit "A."**  As that chart reflects, defendants convicted of some of the largest and most notorious frauds in history have received lesser sentences than the government demands here based on its fanatical devotion to the Guidelines.

The government has failed to offer any such acknowledgement here.  Instead, by endorsing the probation office's draft presentence investigation repot (the "**PSR**") [DE 144] by filing an opposition [DE 160] to Mr. Shapiro's objections to the PSR,[3] it implicitly proposes — without even any real discussion, much less principled explanation — that the Court sentence Mr. Shapiro to 300 months of imprisonment.  Being careful to avoid saying the words "life sentence" in its pleading, the government pretends to undertake a thoughtful and reasonable approach to sentencing by effectively advocating for precisely that result: a 25-year sentence for a 62-year old man with a life expectancy of 20 years.[4]

But the problems with the government's tactics in this case go well beyond the insincerity of its professed rationality and reasonableness.  Of far greater concern is the fact that almost fifteen years after *Booker* — which mandated that district courts expand the scope of factors considered in the sentencing process beyond the Guidelines, effectuating all of the aspects of 18 U.S.C. § 3553(a) — the government basically asks this Court to ignore that ruling, and to confine its evaluation to the Guidelines.  This fact is perhaps no more strikingly apparent than in the Government's own sentencing memorandum, which devotes ***a grand total of 0 pages*** to addressing the § 3553(a) factors.

In other words, the government urges this Court to bring about exactly the result Judge Rakoff warned of when he was tasked with sentencing a defendant in a high-loss fraud case:

> the utter travesty of justice that sometimes results from the
> guidelines' fetish with abstract arithmetic, as well as the harm that

---

[3] The probation office filed its draft PSR under seal on August 9, 2019.  In compliance with Rule 32(f) of the Federal Rules of Criminal Procedure, Mr. Shapiro served *but did not file* his objections to the PSR by email to the probation office and the government on September 25, 2019.  In violation of Rule 32(f), the government thereafter publicly *filed* its response to Mr. Shapiro's objections. [D.E. 160].  The undersigned has requested that the government withdraw its inappropriately filed pleading but the government has not indicated that it intends to do so.  As of even date, the probation office has not met with the parties to discuss Mr. Shapiro's objections or filed its final PSR pursuant to Rules 32(f)(3) and (g).

[4] *See* https://www.ssa.gov/oact/STATS/table4c6.html (undoubtedly, as a cancer survivor, Mr. Shapiro's statistical life expectancy is even less than 20 years).

4

> guideline calculations can visit on human beings if not cabined by
> common sense.

*Adelson*, 441 F.Supp.2d at 512; *see also, United States v. Parris*, 573 F.Supp.2d. 744, 754

(E.D.N.Y. 2008) (where Judge Frederic Block described the Guidelines' application in white collar

crime cases as "a black stain on common sense"). The government's proposed methodology and

sentence also fails to effectuate the Eleventh Circuit's recognition that "[t]here are . . . many

instances where the Guidelines range will not yield a reasonable sentence." *United States v. Hunt*,

459 F.3d 1180, 1184 (11th Cir. 2006); *see id.* ("If *Booker* is to mean anything, it must be that

district courts are obligated to impose a reasonable sentence, regardless of the Guidelines range,

so long as the Guidelines have been considered.").

It is not surprising that a sentence formulation methodology so flawed in theory has

produced a proposed punishment that is so illogical in execution. Mr. Shapiro fully acknowledges

that the shame, humiliation public disgrace, and scorn that he and his family has and continues to

suffer is of his own doing and, therefore, does not expect any sympathy from the Court in

fashioning its sentence. Instead, Mr. Shapiro simply requests a sentence that is rational, not

reflective of the media-induced hysteria and is proportionate to sentences received in comparable

cases. For the reasons detailed more fully herein, Mr. Shapiro respectfully requests that the Court

decline the government's implicit invitation to impose a patently unreasonable sentence. Instead,

he asks that the Court consider all of the factors contained in §3553(a) and formulate a sentence

which truly reflects its mandate.

Specifically, Mr. Shapiro requests that the Court sentence him to a concurrent non-

Guidelines sentence of 150 months for Count One (conspiracy to commit mail and wire fraud, 18

U.S.C. § 1349) and a Guideline sentence of 60 months for Count Ten (evasion of payment of

federal income taxes, 26 U.S.C. § 7201). This request is based upon the spirit and the policy

behind the advisory Guidelines, is supported by the reasons set forth in 18 U.S.C. § 3553(a) as a sentence that is "sufficient, but not greater than necessary to comply with the purpose [of sentencing]" and is not disparate from sentences given in comparable cases.

## II.   APPLICATION OF THE SENTENCING FRAMEWORK.

As the Supreme Court has repeatedly emphasized in the wake of *Booker*, the Guidelines are merely *advisory*. Since issuing the decision in 2005, the Court has continually and unequivocally confirmed its holding by explicitly ***rejecting the notions that***: (i) the Guidelines are "presumptively reasonable," *see Nelson v. United States,* 555 U.S. 350, 352 (2009) ("they are not to be presumed reasonable"); (ii) a non-Guidelines sentence, even one based on a substantial variance, requires extraordinary circumstances, *see Gall v. United States*, 552 U.S. 38, 47 (2007); and (iii) a sentencing court is prohibited from varying from the Guidelines based on a policy disagreement, *see Kimbrough v. United States*, 552 U.S. 85, 107-08 (2007).

As this Court is aware, sentencing involves two steps "(1) the district court must first correctly calculate the advisory guidelines range, and (2) the district court must then consider the [18 U.S.C.] §3553(a) factors in arriving at a reasonable sentence." *United States v. Hoffman*, 710 F.3d 1228, 1233 (11th Cir. 2013). Correctly calculating the Guidelines means not only determining the proper base offense level, applicable enhancements and reductions, and criminal history level, but also then considering relevant Specific Offender Characteristics set forth in Chapter Five, Part H and exploring potential departures provided for in Chapter Five, Part K. *See* §1B1.1(c). While a sentencing court is obligated to apply correctly the Guidelines and take them into account, the resulting Guideline range does not constrain in any form or fashion the "wide discretion" a sentencing court possesses in considering evidence when imposing sentence. *Pepper v. United States,* 131 S. Ct. 1229, 1235 (2011) ("[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the

6

defendant's life and characteristics") (*quoting Williams v. New York*, 337 U.S. 241, 246–247 (1949)).

### A.      Application of Sentencing Guidelines.

Consistent with the Eleventh Circuit's directive, Mr. Shapiro turns first to a discussion of Guidelines' application in this case.  The PSR calculates Mr. Shapiro's total offense level at 53, a criminal history category of 1, and a Guideline imprisonment range of "life."   However, a downward departure is appropriate because (i) "the offense level determined under [§2B1.1] overstates the seriousness of the offense" pursuant to § 2B1.1, Application Note 21(C); (ii) his advanced age and poor health support a departure under Section 5H of the Guidelines; and (iii) the PSR wrongly calculates the enhancements in this case.

### 1.      A downward departure is appropriate under application of Note 20(C).

By endorsing the PSR, the government's decision to premise its sentencing recommendation entirely on Guidelines application brings to the forefront the dramatic impact of the application of sentencing enhancements to this case.   The government's sentencing recommendation rests on an approach which applies seven enhancements which increase Mr. Shapiro's sentence from a base offense level of 7 to an adjusted offense level of 53.  The most significant of these components — by far, representing 28 levels — is the loss enhancement.  While the impropriety of loss creating such a major impact on the sentencing calculation is discussed below, two additional factors combine to warrant departure under Note 20(C).  First, the "factor creep" which results in overlapping enhancements driving the adjusted offense level into the stratosphere, with no real basis.  Second, the dramatic effect on the resulting Guideline range when small enhancements are applied at these dizzying levels. Each is discussed in turn.

### a.      Factor creep.

Professor Bowman aptly describes the "factor creep" problem:

> In 1988, the fraud guideline contained only one aggravating [specific offense characteristic or "SOC"] other than loss amount. By 2000, there were sixteen aggravating SOCs other than loss amount, which could plausibly add from 2 to 14 offense levels in any given case. Moreover, many of these enhancements correlated strongly with the occurrence of high-dollar fraud. . . . [A]s the years passed and the guidelines added more and more SOCs, and thus more and more offense levels to the scores of defendants who by virtue of large loss amounts were already bound for prison, the guideline sentences for such defendants increased disproportionately to those who committed lower-loss crimes.

Bowman, *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 Fed. Sent'g Rep. 270, 271 (June 2015).

Other commentators have echoed those concerns:

> Where enhancements are sufficiently distinct to escape the vice of double counting, but nonetheless substantially overlap (such as corporate fraud cases with a high loss and enhancements for leadership role, sophisticated means, more than $1,000,000 gross proceeds, etc.), the overlap can, according to the Second Circuit, over punish defendants in a manner and degree not contemplated by the Sentencing Commission.  In such cases, a downward departure may be appropriate.

Haines, et al., *Federal Sentencing Guidelines Handbook*, § 2B1.1, § 32 (2014-15 ed.).  In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales). . . . The precision is false." *See,* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180, 1999 WL 730985 (1999).

Since the Commission has not corrected the problem of multiple overlapping enhancements (and indeed exacerbated the problem), many courts have recognized that a

8

departure or variance is warranted to avoid it.  *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *Parris*, 573 F. Supp. 2d at 745 (E.D.N.Y. 2008) (guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1); *Adelson*, 441 F. Supp. 2d at 510-15 (S.D.N.Y. 2006) (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

Thirty-six of the levels used to calculate Mr. Shapiro's Guideline range come from specific offense characteristics in §2B1.1 (28 levels for loss of between $250,000,000 to $550,000,000, 6 levels for an offense that involved 10 or more victims, and 2 levels for sophisticated means), and another eight come from adjustments under Chapter Three (4 levels for vulnerable victims and 4 levels for role in the offense).  Collectively, these enhancements create an additional 354 months (or 24.5 years) of sentencing exposure — separate and apart from what he already faced for the base offense level.  However, as legal scholars have noted, these factors are "closely correlated" with each other and with loss:

> In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id*. "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide . . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant

> over and over for the same basic thing – conducting a big fraud in a
> corporate setting.".

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039 at *170 (Feb. 2008); *see also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648- 49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while the guidelines fail to take into account important mitigating offense and offender characteristics.")

Even the Sentencing Commission has recognized the dramatic impact of added adjustments to the Guidelines. In its publication entitled *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform,*[5] the Commission termed the phenomenon "factor creep" and observed that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Id*. at 137.

b.      **Accelerating impact of identical enhancements at higher levels.**

The second issue with the Guidelines is that they disproportionately punish identical enhancements as the total offense level increases. Professor Bowman once again defines the issue:

---

[5] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

> Key to understanding the current dysfunction of the fraud guideline for high-loss offenders is recognition that, because of the logarithmic character of the 43-level Sentencing Table, each increase in offense level has an ever-greater absolute effect on sentence length, the higher one goes up the Table.

*Damp Squib*, at 271.  A simple example helps highlight this shortcoming in the Guidelines.  Where a defendant's adjusted offense level stands at 14, a 2 point enhancement increases his sentencing exposure by 6 months, taking the applicable range from 15-21 months to 21-27 months.  But when the defendant's adjusted offense level reaches greater heights, the same enhancement has a far more draconian effect.  For example, at level 38, that 2-point enhancement now increases the applicable range from 235-293 months to 292-365 months.  In other words, the same conduct triggering the same enhancement is punished ten times more harshly - ***from 6 months to almost 6 years*** - when loss levels are increased but everything else is held constant.

Professor Bowman offers additional insight on the resulting dilemma:

> By contrast [to the robbery guideline], §2B1.1 sets no meaningful upper limit on the punishment for economic crime. In high-loss cases, the current version of §2B1.1 can quite easily generate offense levels substantially above the 43 required for life imprisonment, which implies that the Commission thinks big financial fraud is normatively far worse than murder, treason, being a trigger-happy bank robber, or running a major drug cartel. This sort of guideline excess breeds two problems.
>
> First, virtually no one believes that financial fraud is worse than murder or treason or blood-soaked bank robbery; in consequence, with rare exceptions, judges are unwilling to sentence high-loss fraud defendants to the terms nominally prescribed by the guidelines. Indeed, in those cases that score worst by the metrics adopted in §2B1.1, the guidelines do not actually prescribe a sentence. An offense level over 43 is not associated with a recommended term of imprisonment; it is merely a ***really big number***—a sort of numerical epithet—that provides the sentencing judge with no practical guidance.
>
> Second, and even more importantly as a matter of guideline design, because §2B1.1 so easily generates offense levels near or above the

11

> top of the sentencing table, judges have no useful yardstick for
> determining the relative severity of cases with lower offense levels.

*Id.* at 278 (emphasis in original).

In a case where the PSR sets an adjusted offense level of 53 and the government has effectively recommended a life sentence, "factor creep" and the concerns Professor Bowman regarding expressed are not only prescient, but well-grounded.  The Court is specifically empowered by the Guidelines to ameliorate the strikingly disproportionate result the mathematical calculation called for produces.  Mr. Shapiro respectfully requests that the Court exercise that authority here and depart downward in accordance with Application Note 21(C).

**2.     Mr. Shapiro's advanced age and poor health also warrant downward departures**

The Sentencing Commission established a policy that a defendant's advanced age and mental and emotional conditions may justify a downward departure from the Guidelines.  *See* Guidelines §§ 5H1.1 and 5H1.3.  As discussed in more detail below, at the age of nearly 62 years and as a cancer survivor in poor physical and mental health, Mr. Shapiro not only poses a low risk of recidivism, but, considering that his expected lifespan is less than 20 years, a lengthy sentence would be equivalent to a "life" sentence.  For this reason, the Court should exercise its discretion to issue a downward departure from the Guidelines.

**3.     Objection to PSR's application of the Loss Enhancement.**

Mr. Shapiro has previously objected to the loss enhancement in the PSR, which he incorporates herein but summarizes below.

The government bears the burden to prove by a preponderance of the evidence a reasonable estimate of the amount of the victim's loss.  *United States v. Baldwin*, 774 F.3d 711, 728 (11th Cir. 2014).  The government argues that Mr. Shapiro should receive a 28 level loss enhancement for causing losses of between $250,000,000 to $550,000,000.  However, the government has not met

its burden of proving by a preponderance of the evidence what the loss was.  Accordingly, the Court should limit the loss in this case to $25 million, which Mr. Shapiro has admitted to.  *See Stipulated Factual Proffer,* p. 6.  Therefore, pursuant to § 2B1.1(b)(1)(L), Mr. Shapiro's enhancement should only be 22 levels.

### B.        Grounds Exist for Deviating from the Guidelines

Fifteen years after the Supreme Court's landmark *Booker* decision, it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  The Guidelines are no longer "the only consideration" at sentencing.  *Gall*, 552 U.S. at 49.  Rather, the Guidelines "merely" provide a "starting point" for the Court's sentencing considerations.  *Id.*; *United States v. Matchett*, 802 F.3d 1185, 1194 (11th Cir. 2015).  The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case.  *Gall*, 552 U.S. at 49.  The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range."  *Id.* at 47.  As one district court judge has put it the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."  Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise – and Change: The Judge Who Said No*, 99-OCT A.B.A. J. 50, 53.

This is especially true for economic crime cases, where the sentencing range is largely determined by escalating loss enhancements pursuant to §2B1.1, and overlapping cumulative upward adjustments, an increasingly criticized approach that usually results in draconian advisory guidelines.  *See, e.g., Adelson*, 441 F. Supp. 2d at 512 (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also, Parris*, 573 F. Supp. 2d at 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines

"reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guideline range of 360 to life."). The Supreme Court and Eleventh Circuit's decisions have significantly broadened courts' discretion to impose a less stringent sentence than the one suggested by the Guidelines, and in this case, the Court should exercise its broad discretion and impose a sentence substantially below the recommended guideline range.

To that end, it is beyond dispute that the analysis mandated by 18 U.S.C. §3553(a) is far more expansive than the review called for under the Guidelines. *Gall*, 552 U.S. at 50 n.6, 56-60 (§3553(a)(1) deemed a "broad command to consider . . . the history and characteristics of the defendant"). Separate and apart from the Guidelines review conducted above, the factors relevant to a §3553(a) analysis merit a sentencing reduction in the form of a downward variance. The Court should impose a sentence substantially lower than the advisory guideline range for the following reasons, including:

- Robert Shapiro has significant medical issues, including cancer.

- Robert Shapiro unilaterally and preemptively took steps to minimize the damage to his victims and take blame for the offenses he committed by, among other things: (i) removing himself from Woodbridge's management, installing an independent Chief Restructuring Officer, and facilitating a bankruptcy proceeding; (ii) voluntarily resolved the SEC proceeding; and, immediately thereafter, (iii) attempted to voluntarily resolve his criminal proceeding by preemptively attempting to contact the U.S. Attorney's Office.

- The Guidelines applicable to Robert Shapiro have no empirical basis and call for the Court to impose overlapping and cumulative adjustments.

- Based upon similar cases involving economic crimes, a sentence within the Guideline range will create great national and local disparity.

- Because of his age, education, marital status, lack of drug abuse, criminal history category, and nature of his offense, Mr. Shapiro poses a very low risk of reoffending

1.    **"The history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1))**

Arguably the most dramatic impact of rendering the Guidelines advisory has been the expansion of the factors eligible for consideration regarding the defendant's personal characteristics. Unlike the narrow range of details deemed relevant under the Guidelines, consideration of the history and characteristics of the defendant in accordance with §3553(a) allows for a review of a wide range of evidence. As the Supreme Court noted in *Rita v. United States*:

> The [Sentencing] Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are not ordinarily considered under the Guidelines. *See* USSG. Manual §§ 5H1.1-6, 11, and 12 (Nov. 2006). These are, however, matters that §3553(a) authorizes the sentencing judge to consider.

551 U.S. 338, 364-65 (2007) (Stevens, J. and Ginsburg, J., concurring). The most critical of those factors are reviewed below.

Robert Shapiro is one of two children born to Charles Miller and Suzan Holzer, both deceased. His parents divorced when he was four years old, causing him to become involuntarily estranged from his father. To make matters even more challenging, to spite his father, Mr.

15

Shapiro's mother gave their second son, Mr. Shapiro's brother, up for adoption when he was born. Mr. Shapiro was so young at the time his brother was given up for adoption that Mr. Shapiro did not know he had a brother until almost 20 years later.  When he learned of his brother's existence, Mr. Shapiro became so angry and disillusioned with his mother that he cut off ties with her.

During his early childhood, Mr. Shapiro's single mother worked hard to make ends meet for her and her son but they struggled and he grew up very poor.  Their economic situation improved when Mr. Shapiro's mother remarried.  This new marriage afforded Mr. Shapiro and his mother a modest financial status.  Although they were by no means wealthy, Mr. Shapiro's mother became an extravagant spender and lived a lifestyle substantially beyond her means.  Mr. Shapiro acquired his taste for luxuries and bad financial habits by observing his mother's insatiable desire to impress others during these early years – an unfortunate example that led him on the path that has brought him before the Court today.

Nonetheless, even with their modestly-improved financial condition, Mr. Shapiro had a very unfortunate childhood.  In addition to being involuntarily estranged from his father, Mr. Shapiro's mother sent Mr. Shapiro to boarding school as child because she was not interested in raising him.  The combination of these factors left Mr. Shapiro feeling hopeless and "abandoned."

Although Mr. Shapiro acknowledges his conduct and "offenses" and that he has "free will," these painful events during his formative years, exacerbated by misplaced priorities and delusions of grandeur, were harbingers of Mr. Shapiro's future crimes.

Mr. Shapiro is now almost 62.  His age suggests that a lengthy prison sentence would be particularly deleterious.  A study commissioned by the Department of Justice's National Institute of Corrections concluded that imprisonment is especially problematic for older inmates like Mr. Shapiro, finding that "several important factors seem to speed the aging process for those in prison"

and identifying numerous management problems associated with older inmates. *See Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, National Institute of Corrections, U.S. Department of Justice, Correctional Health Care (2004)[6] at 8-9. This study noted that older inmates are uniquely vulnerable to abuse and predation; experience difficulty in establishing social relationships; often need special physical accommodations in a relatively inflexible physical environment; and need special programs in a setting where special privileges are disdained. *Id.* at 11. The study found that older first-time offenders "are frequently severely maladjusted and especially at risk for suicide, explosiveness, and other manifestations of mental disorder." *Id.* Moreover, "[s]ince their behaviors are not well tolerated by other inmates, their victimization potential is high." *Id.* Indeed "[o]lder inmates may have difficulty relating to younger, more aggressive inmates. Additionally, they are prone to being victimized by younger inmates." *Id*. at 30.

> 2. **"The need for the sentence imposed . . . to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense" (18 U.S.C. § 3553(a)(2)(A))**

The next element of §3553(a) focuses on formulating a sentence which: (i) reflects the offense's seriousness; (ii) promotes respect for the law; and (iii) provides just desserts. In evaluating these associated factors, district courts may appropriately consider all forms of "punishment" that flow from conviction, not simply that which is measured in months of incarceration. As the court in *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) recognized, "when evaluating the justness of . . . punishment for the purposes of reaching a reasonable sentence under *United States v. Booker*, it is important to consider all other forms of punishment [the defendant] has already suffered." (finding variance appropriate where defendant

---

[6] Available at https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf

was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of proceeding); *see also, United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

Mr. Shapiro stands before this Court having lost his business, penniless, and with a much-deserved noxious reputation. Not only have Mr. Shapiro's criminal acts caused him to become financially and professionally ruined but he is a social pariah—those who he considered his closest friends and family members have avoided contact with him since he was arrested. These factors add to the punitive nature of Mr. Shapiro's conviction and mitigate the need for additional punishment arising from an overly-lengthy sentence of incarceration. *See United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming departure based in part on ways in which defendant "suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Redemann*, 295 F. Supp. 2d 887, 896-97 (E.D. Wis. 2003) (departing downward, in part, because "a great deal of adverse publicity in [defendant's] small town . . . injured his business, which was dependent on defendant's reputation and good will" and thus "partially satisfied the need for just punishment" and general and specific deterrence).

As such, there is no need to adopt the government's sentencing recommendation in order to ensure that this component of §3553(a) will be satisfied.

###    3.    "The need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" (18 U.S.C. § 3553(a)(2)(B)).

In economic crime sentencing, the need for deterrence is frequently touted as a compelling basis for imposition of a prison sentence. Indeed, oft-quoted legislative history reflects that Congress has noted that deterrence is "particularly important in the area of white collar crime." *See United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (internal quotation marks

omitted).  The reason for that approach is not clear, but it is noteworthy that the government offers nothing to support it.  In fact, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"); Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions").  Courts in high loss cases have reached similar conclusions, both in word and in deed.  *See Gupta*, 904 F. Supp. 2d at 355 ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not. Thus, a relatively modest prison term . . . is 'sufficient, but not more than necessary' for (general deterrence) purposes."); *Adelson*, 441 F. Supp. 2d at 514 ("there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").

In fact, even the Department of Justice agrees that lengthy sentences are not necessary to meet the goals of deterrence.  In a publication recently issued by the Justice Department's National Institute of Justice (which is a component of the department's Office of Justice Programs), the DOJ recognized as follows:

- "The certainty of being caught is a vastly more powerful deterrent than the punishment."

- "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."

- "Increasing the severity of punishment does little to deter crime.

*See* National Institute of Justice, *Five Things About Deterrence*, June 5, 2016.[7]

The government's apparent reliance on the need for deterrence as the basis for its request that the Court impose a 300-month sentence cannot be reconciled with these authorities, and lacks any principled basis. A "short but definite period of confinement," rather than one that extends 25 years, fulfills the mandate of §3553(a)(2)(A).

4. **"The need for the sentence imposed . . . to protect the public from further crimes of the defendant." (18 U.S.C. § 3553(a)(2)(C))**

The need to protect the public from a defendant's further crimes is the one of greatest §3553(a) concerns, and also the most capable of being measured. Statistically speaking, Mr. Shapiro's personal characteristics and the nature of his offense place him at the lowest risk to recidivate of any offender type. Specifically, Mr. Shapiro poses virtually no risk of recidivism due to: (i) the nature of his crimes; (ii) his advanced age (now ***and*** at the likely time of his release); (iii) his history of serious health issues; (iv) the lack of history of substantial drug use; (v) the of fact that he has been married for over 12 years; (vi) his level of education; and (vii) the damage done to his reputation which virtually ensures that he will never be entrusted to manage third parties' finances. This low risk of recidivism militates against a long prison term. *See, e.g., United States v. Campbell,* 762 Fed. Appx. 877, 879 (11th Cir. 2019) (affirming 44 month downward departure due to low risk of recidivism).

As to the nature of the instant offense, the Sentencing Commission recognizes that "white-collar" offenders pose very little risk of reoffending. USSC, *Measuring Recidivism: The Criminal*

---

[7] Available at: https://nij.ojp.gov/topics/articles/five-things-about-deterrence

*History Computation of the Federal Sentencing Guidelines,* at 13.[8]  Statistical data from a study commissioned by the Sentencing Commission also show that "[r]ecidivism rates decline relatively consistently as age increases." *Id.* at 12.   Some cogent statistics from the Sentencing Commission's studies that support Mr. Shapiro's low recidivism risk include:

- **Age[9]:** A defendant over the age of 50 and over and in Criminal History Category I has a 6.2% likelihood of recidivating.  *Measuring Recidivism* at 28.

- **Level of Education and Lack of Drug Use:** Mr. Shapiro's level of education and lack of illicit drug use also make recidivism highly unlikely.  *See id.* at 12-13.

- **Employment Status**: defendants who have a steady employment track record have a 12.7% rate of recidivism.  *Id.* at 29.

- **Marriage:** offenders who were ever married are only at a 9.8% risk of recidivism. *Id.*

- **Drug Use**: offenders who have no history of substantial illicit drug use have a recidivism rate that is half that of those who have a drug history. *Id.*

- **First-Time Offender Status:** First-time offenders have a recidivism rate of 6.8%, and a re-conviction rate of only 2.5%.  *Recidivism and the "First Offender,"* at 6.

For those like Mr. Shapiro who possess all of the above characteristics, the recidivism rate is certainly much lower.  Similarly, as discussed above, the Guidelines also recognize that an offender's advanced age and mental and emotional condition may justify a downward departure from the Guidelines. *See* Guidelines §§ 5H1.1 and 5H1.  Further, the Commission has not found any correlation between white-collar convicts' offense level and risk of

---

[8]    Available at:   https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines
[9] The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account.  *See* "Recidivism and the 'First Offender,'" at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation").  The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure.  USSG § 5H1.1, p.s.

recidivism.  *See* USSC, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at p.20 (March 2016).[10]

Mr. Shapiro deserves the personal, professional, and financial ruin he has brought upon himself.  However, there is no reason to believe that a sentence within the advisory guideline range is necessary to prevent him from committing further crimes.  Simply put, there is no need – and certainly no basis – to impose a lengthy sentence on Mr. Shapiro based on fear of recidivism.  That already minimal risk will only decline further, as the Sentencing Commission has recognized.  Accordingly, the Court should reject the government's recommendation to the extent it relies in any way on the need "to protect the public form further crimes of the defendant."  18 U.S.C. § 3553(a)(1)(C).

> ### 5.      "The need to provide the defendant with . . . medical care . . . in the most effective manner." (18 U.S.C. §3553(a)(2)(D)).

Section 3553(a) recognizes that the Court should take into account Mr. Shapiro's medical issues and whether the sentence imposed will "provide the defendant with needed . . . medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  The Guidelines likewise provide that: "[p]hysical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guideline."  USSG §5H1.4.

Courts routinely impose below Guidelines sentences in cases involving defendants who suffer from serious medical conditions.  For example, following the defendant's conviction after

---

[10]      Available    at:    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf ("The Commission did not find a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism. Under the guidelines, the seriousness of an offender's federal crime is measured by a final offense level score ranging from one to 43. There is not a strong correspondence between final offense level and recidivism.").

trial for wire fraud in *United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010), the sentencing court imposed a sentence of one month incarceration and five years' probation despite a Guidelines range of 57-71 months where the defendant suffered from degenerative diabetes. *Id*. at *1-2; *see also United States v. McFarlin*, 535 F.3d 808, 810-11 (8th Cir. 2008) (affirming variance for 56-year old defendant with numerous health problems, including coronary disease and who had undergone several operations); *United States v. Alatsa*s, 2008 WL 238559 at *2 (E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines range of 24-30 months where, inter alia, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison.").   In *United States v. Barbato*, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002), a pre-*Booker* decision, the defendant pled guilty to using extortionate means to collect extensions of credit.   The sentencing court granted a downward departure from a then-mandatory Guideline range of 24-30 months' imprisonment based on the defendant's history of heart problems, and imposed a sentence of home detention and two years of supervised release.   Notably, the *Barbate* court imposed home confinement even though the prosecution contended that the Bureau of Prisons would be able to provide adequate treatment for the defendant's health conditions.   *Id*. at *5.   The court noted that "[i]t is often relevant, though not always controlling, whether the BOP can provide adequate care." *Id*. at *4.

For all of these reasons, Mr. Shapiro's history of cancer, which requires regular screenings and treatment, and advanced age weigh in favor of a sentence substantially below the advisory guideline range.

      **6.**     **"The kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." (18 U.S.C. § 3553(a)(4))**

In accordance with 18 U.S.C. § 3553(a)(4), this section reviews §2B1.1's widely recognized deficiencies and further demonstrates the impropriety of applying it as the government urges.

      **a.**     **Because the fraud Guideline was not developed through collection and consideration of empirical evidence, the Court is free to conclude that it produces a sentence which is "greater than necessary"**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. §991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. §994(m). Thereafter, the Commission was supposed to continually review and revise the Guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. §§ 991(b)(1)(C) and (b)(2), 994(o), and 995(13), (15), and (16). The Commissioners abandoned the effort to design the Guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the Guidelines on an empirical study of time served for various offenses before the guidelines. *See* Guideliens, Ch. 1 Pt. A(3); *see also, "*The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," at 1, 7.

In *Rita v. United States*, the Supreme Court gave two reasons that it may be "fair to assume" that the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." 551 U.S. at 350. First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had

done in the past." *Id.* at 349.  Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts.  *Id*. at 348-50.  The Supreme Court recognized, however, that not all Guidelines were developed in this manner.  *See Gall*, 552 U.S. at 46 & n.2; *Kimbrough*, 552 U.S. at 96.  When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

Courts have recognized that Section 2B1.1 is the type of Guideline that the Supreme Court warned may not be based on "empirical data and national experience" and from which they may deviate.  *See, e.g.*, *Corsey*, 723 F.3d at 378 (Underhill, J., concurring) ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices"); *Gupta*, 904 F.Supp.2d at 351 ("[t]he Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data"); *United States v. Lenagh*, 2009 WL 296999 at *6 (D. Neb. Feb. 6, 2009) ("because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines").  In fact, the loss table in §2B1.1 is so removed from empirical foundation that Judge Rakoff has famously written that the Guideline's arithmetic calculations result in sentencing ranges driven principally by

"numbers . . . drawn from nowhere." *See* Jed S. Rakoff, *Why The Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent'g Rep. 6, 8-9 (October 2013).

> **b.      Without basis or explanation, the loss enhancement available under §2B1.1 far exceeds any other enhancement available anywhere else in the Guidelines.**

The government urges the Court to increase Mr. Shapiro's offense level by 28 levels under §2B1.1(b)(1)(O) based on the calculated loss.   The absence of any empirical basis for that Guideline's produces an result which is not simply unreasonable in theory, but in fact completely incongruous with other enhancements available under the Guidelines.   As the table below demonstrates, even conduct which is far more harmful in nature allows for enhancements which are less - and, in some cases, far less - than what §2B1.1 permits.

| Enhancement | Guideline | Level increase |
|---|---|---|
| Obstruction of justice related to terrorism | §2Jl.2(b)(l)(C) | 12 |
| Felony involving or intending to promote terrorism | §3Al.3(a) | 12 |
| Willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life and while prohibited to possess a weapon | §2Kl.5(b)(1) | 17 |
| Trafficking, receiving or possessing a portable rocket, missile, or launcher | §2K2.1(b)(3)(A) | 15 |
| Unlawfully entering or remaining in the United States after being convicted of certain major felonies | §2Ll.2(b)(1)(A) | 16 |
| Bid-rigging or price-fixing, if the volume of commerce exceeds $1,500,000,000 | §2R1.1(b)(2)(H) | 16 |

Yet, amazingly, when you compare the largest enhancements for loss amount under Section 2B1.1 to all other enhancements under the Guidelines, even in arguably more serious and morally reprehensible offenses, the enhancements in Section 2B1.1 dwarf the others, sometimes by multiples.

26

> **c.    The irrational nature of the fraud Guideline is further demonstrated by considering the much more serious offenses which carry a lower sentencing range.**

Comparison of the adjusted offense level advocated by the government—53—to  those which are triggered by other offenses further illustrates that the fraud Guideline is deeply flawed. Under the government's proposed offense level, the Guidelines recommend imposing on a first-time, nonviolent offender a prison term longer than (and, in many instances, far longer than) that recommended for offenses that are unquestionably more serious.   Some of the most striking examples of offenses which would carry a lower sentence than the government demands be imposed on Mr. Shapiro are listed below:

- Second degree murder (Guideline §2A1.2)

- Bank robbery involving use of firearm, resulting in permanent or life-threatening bodily injury, resulting in loss of between $3-$5 million (Guideline §2B3.1)

- Assault with intent to commit murder (Guideline §2A2.1(a)(1))

- Distribution of an unlimited quantity of every type of unlawful drug (Guideline §2D1.1)

- Arson creating a serious risk of death or bodily injury (Guideline §2K1.4)

- Trafficking a child under the age of 16 to engage in a sexual act (Guideline §2G2.3)

- Sexual abuse of a child under 12 years old (Guideline §2A3.1)

- Unauthorized acquisition of and threat to use nuclear and biological weapons and other weapons of mass destruction (Guideline §2M6.1)

- Hijacking an airplane by force or violence (Guideline §2A5.1(a))

The notion that Mr. Shapiro faces a greater punishment than a defendant who intentionally murders another, acquires and threatens to use a nuclear bomb, traffics children for the purpose of

exposing him or her to horrific sexual abuse, or someone who actually inflicts such abuse, illustrates the absurdity of the Guideline range the government sponsors here.

> **d.      This outcome is of relatively recent vintage, as the Guidelines as originally structured contemplated a far more reasonable sentence.**

Because of the loss caused by Mr. Shapiro, the government's sentencing demand bears no resemblance to the average sentence deemed appropriate when the Sentencing Commission adopted the original guidelines in 1987 and "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, *supra*, 17 Hofstra L. Rev. at 22-23. The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-4 months and no more than 24-30 months for defendants in Criminal History Category I. *See* §2B1.1 and Chapter 5, Part A (1987).

The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); *see also Fifteen Years,* at 56 (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement"). In discussing this, Professor Bowman noted:

> A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders. One indicator of sufficient stringent penalties for a class of crimes would be an increase in the general incidents of such crimes. However, the available statistics show exactly the opposite trend for economic offenses.

Frank O. Bowman, III, 1 Ohio St. J. Crim. Law at 419 (2003-2004) (collecting evidence).

Of course, this grossly disproportionate enhancement of 28 points under Section 2B1.1(b)(1) does not alone cause the offense level to calculate at a life range. No, instead "lopped" on to the base offense level calculations in the PSR are increases by six levels for causing a

substantial financial hardship to 25 or more victims, two levels for "sophisticated means," and four levels for harm to a large number of vulnerable victims a resulting base offense level 53 ("life"). One wonders how it would be realistic to expect a multi-million dollar loss fraud <u>not</u> to involve numerous (vulnerable) victims and involve sophisticated means (as defined so broadly by the Guidelines). Thus, for all practical purposes before any other common upwards adjustments are even considered, such as Role in the Offense (Section 2B1.1(a)) a multi-million dollar loss fraud will almost universally yield a "life" sentence under the guidelines.

This draconian result is further magnified by what becomes a meaningless application in this case of Section 3E1.1(a) "Adjustment For Acceptance of Responsibility." Normally, a defendant's decision to accept responsibility, assist in the investigation of his crime, plead guilty and conserve the government's and Court's resources is meaningfully recognized under the Guidelines (usually a 3 level reduction pursuant to Sections 3E1.1(a) and 3E1.1(b)). Here, as a result of a determination that the total offense level is 53, the application of Sections 3E1.1(a) and 3E.1.1(b) are meaningless. Mr. Shapiro gains no benefit whatsoever under the Guidelines for what has clearly been extraordinary acceptance of responsibility. Given this arithmetic absurdity, Mr. Shapiro would suffer no less under the Guidelines if he had cost the government millions by going to trial.

The Commission quickly abandoned its original goal of ensuring "short but definite" sentences and, beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. These changes caused Mr. Shapiro's advisory guideline range has increased as follows:

| BOL / enhancement | 1987 | 1989 | 2001 | 2015 |
|---|---|---|---|---|
| Base offense level | 4 | 4 | 6 | 7 |
| Loss | 13 | 20 | 26 | 28 |
| Number of victims | 0 | 0 | 4 | 6 |

| BOL / enhancement | 1987 | 1989 | 2001 | 2015 |
|---|---|---|---|---|
| Violation of prior order | 0 | 0 | 0 | 2 |
| Sophisticated means | 0 | 0 | 2 | 2 |
| Vulnerable victims | 2 | 2 | 2 | 2 |
| Large number of vulnerable victims | 0 | 0 | 2 | 2 |
| Role in offense | 4 | 4 | 4 | 4 |
| Adjusted offense level | 23 | 30 | 46 | 53 |
| **Guideline range (months)** | **46-57** | **97-121** | **360-life** | **360-life** |

As a result of these continuous increases, the low end of the applicable range increases from 46 to 360 months, an upsurge of 783%. The high-end escalation is even more jarring: a defendant who would have faced a high-end sentence of 4.6 years in 1987 now faces life.

In response to the fraud Guideline's progressively increasing severity, numerous sentencing judges have continued to refer to the original 1987 fraud guideline in making sentencing determinations. *See, e.g., United States v. Watts*, 10-cr-00627 (E.D.N.Y. Apr. 24, 2014), Sentencing Tr. at 18:24-19:5; 45:18-20 (sentencing defendant within 1987 guidelines range based on counsel's recommendation); *United States v. Hochfeld*, 13-cr-00021 (S.D.N.Y. Aug. 5, 2013), Sentencing Tr. at 20:4-9; 21:6-9 (using 1987 manual to calculate 30 to 37 month guidelines range in lieu of applying the "harsh result" using the current manual).  Under that Guideline, adopting the government's loss figure, without factoring in any downward departures, Mr. Shapiro's adjusted offense level would be 23. The figure yields a sentencing range of 46-57 months.

Despite ample precedent for sentencing Mr. Shapiro under previous versions of the Guidelines, Mr. Shapiro does not expect the Court to adopt that practice.  Rather, Mr. Shapiro merely asks the Court to recognize that the Guideline enhancements and sentences for large-figure financial crimes have become so removed from the original Guidelines and untethered to the

Commission's directive to base the Guidelines on "empirical data" so as to render them effectively meaningless.  Accordingly, Mr. Shapiro submits that a below Guideline sentence is appropriate.

> **7.     "The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3553(a)(6))**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The Court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall,* 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); and unwarranted differences among defendants whose conduct and characteristics are similar. *See Parris*, 573 F. Supp. 2d at 753, 756-62.  In ensuring uniformity of sentences, courts should consider similar cases in other districts.  *United States v. Duhon*, 440 F.3d 711, 721 (5th Cir. 2006) ("[t]he district court should have considered the need to avoid disparity among similarly-situated defendants nationwide rather than disparity with Duhon's differently-situated codefendant"); *Bonds v. United States*, 2015 U.S. Dist. LEXIS 123550 at *18 n.11 (M.D. Ala. 2015) ("reduc[ing] a sentence because of a perceived disparity between the sentences of one defendant and that of his co-defendant in the same case creates a new and unwarranted disparity between that first defendant's sentence and the sentences of all the defendants nationwide who are similarly situated.") (*quoting United States v. Thompson*, 218 Fed. App'x 413, 416-17 (6th Cir. 2007)).

The defense has undertaken to collect information on similarly situated cases nationwide. The result of those efforts is contained in the chart attached as **Exhibit "A,"** which compiles information regarding approximately 25 recent sentences imposed by judges around the country in similar fraud cases which were as serious and, in many instances, arguably more serious than

the current case.  The value of that laborious exercise is clear: a sentence of 300 months' imprisonment is not just.

General statistics regarding sentencing trends also support a below Guideline sentence.  In fiscal year 2018, sentences below the Guideline range were imposed in 57.5% of all fraud cases; 15.2% were government-sponsored, 42.3% were non-government sponsored. *See* USSC, *2018 Annual Report and Sourcebook of Federal Sentencing Statistics*, tbl.E-7.[11]  A sentence for Mr. Shapiro within the Guideline range would exaggerate the disparity that the law demands be narrowed.

## III.   FACILITY.

Regardless of the sentence that the Court imposes on Mr. Shapiro, he requests that the Court recommend that he serve his sentence in a facility near his wife, his primary source of support, and home in Los Angeles, California.  Specifically, Mr. Shapiro requests that he be imprisoned in FCI Lompoc in Lompoc, California.  Additionally, to assist Mr. Shapiro with his longstanding abuse of alcohol, Mr. Shapiro respectfully requests that the Court recommend to the Bureau of Prisons that Mr. Shapiro be allowed to enroll in a Residential Drug Abuse Program.

### CONCLUSION

Mr. Shapiro respectfully requests that the Court reject the proposed sentence, which is so obviously flawed that it could fairly be characterized as a defiant attempt to nullify what *Booker* so clearly requires.  Instead, Mr. Shapiro requests that the Court follow the mandate of that case, its progeny, and § 3553(a) by undertaking the type of thorough and principled sentencing review that is required to formulate a sentence which accounts for all relevant factors.

---

[11]   Available at:  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report-and-Sourcebook.pdf

Dated: October 10, 2019

Respectfully submitted:

*/s/ Elan A. Gershoni*
Ryan D. O'Quinn (FBN: 513857)
DLA PIPER LLP (US)
Elan A. Gershoni (FBN: 95969)
200 S. Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone:  305.423.8500
Facsimile:  305.437.8131
ryan.oquinn@dlapiper.com
elan.gershoni@dlapiper.com

*Attorneys for the Defendant Robert Shapiro*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 10, 2019, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Elan A. Gershoni*
Elan A. Gershoni