**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-20178-CR-CMA**

**UNITED STATES OF AMERICA**

**v.**

**ROBERT SHAPIRO,**

      **Defendant.**
_____/

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

The United States of America respectfully submits this sentencing memorandum for the Court's consideration. For years, Shapiro spearheaded an aggressive fraud, *Ponzi*, and tax evasion scheme, through which he personally netted more than $36 million. *See* Ex. 1. Shapiro's profit was not coincidental, but rather by design; the entire point of the complex conspiracy that blossomed at Woodbridge was to enrich Shapiro, his family members, and his co-conspirators at the expense of investors and the Internal Revenue Service. Shapiro spent his fraudulently obtained money cavalierly, on luxury homes, wines, designer clothing and custom-designed jewelry for his wife, country club fees, travel, Chagall paintings, gold coins, and in sizable donations to political causes matching his personal beliefs. *Id.* These plainly personal expenses were financed on the backs of elderly investor victims' nest eggs, for whom their investments – which were modest, in comparison to Shapiro's expenditures – meant everything. Some of these elderly victims worked for decades for their hard-earned dollars, and – because of the substantial financial losses Shapiro caused them – they will now have to go back to work in their own retirement age in order to afford living expenses. The fallout is emotional and physical, not just financial. Against this backdrop, Shapiro's age and health are no justification for his crimes or for the significant departure he seeks. For years, he stole from other retirees to pad his own retirement lifestyle, all because of his greed.

In addition to defrauding thousands of investors, the majority of whom were – like Shapiro – over sixty years old, Shapiro's crimes involved deception to regulatory agencies, including the Securities and Exchange Commission ("SEC") and the Internal Revenue Service ("IRS"), and efforts to shield his assets from seizure that continued even after his arrest. To this day, Shapiro seeks to minimize his actions, as he denies the scope of the harm caused by the fraud he devised and led. A substantial sentence is warranted based on his years of egregious conduct, the scheme's devastating impact on a vulnerable population, the need for specific and general deterrence, and the need to promote respect for the law. For the reasons explained below, and to be detailed via testimony at the sentencing hearing, the Court should sentence him to a term of twenty-five years' imprisonment, which will provide sufficient, but not greater than necessary, punishment.

I.      **PROCEDURAL HISTORY**

On April 4, 2019, a grand jury in the Southern District of Florida returned an indictment charging Defendants Shapiro, Dane Roseman a/k/a "Dayne Roseman" ("Roseman"), and Ivan Acevedo ("Acevedo") with one count of conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count 1); Shapiro and Acevedo with one count of mail fraud, in violation of Title 18, United States Code, Section 1341 (Count 2); Shapiro and Roseman with four additional counts of mail fraud, in violation of Title 18, United States Code, Section 1341 (Counts 3 through 6); Shapiro and Roseman with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 7 through 8); Shapiro with one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count 9); and Shapiro with one count of evasion of payment of federal income taxes, in violation of Title 26, United States Code, Section 7201 (Count 10). *See* D.E. 3, 11.

Trial in Defendant Shapiro's case was subsequently scheduled to begin with jury selection on August 5, 2019 based upon his assertion of his speedy trial rights (D.E. 79).[1]

On August 7, 2019, Shapiro changed his plea from not guilty to guilty. Pursuant to a plea agreement, he pled guilty to Counts 1 and 10 of the Indictment (D.E. 139); he also signed, along with his counsel, a stipulated factual proffer in support thereof (D.E. 140).

Shapiro filed objections, and the Government filed a response to Shapiro's objections (D.E. 160), to the Presentence Investigation Report ("PSR").[2] Shapiro also filed a 39-page sentencing memorandum on October 10, 2019 (D.E. 163). The Final PSR and Addendum thereto were issued on October 11, 2019 (D.E. 164).

## II. FACTUAL BACKGROUND

### a. The Fraud Scheme and Money Laundering Activities

Shapiro spearheaded a $1.3 billion *Ponzi* scheme through a network of entities, including Woodbridge Group of Companies, LLC (collectively, "Woodbridge"), that involved the sale of securities to more than 8,000 people. Woodbridge employed approximately 130 people in offices in six states, the first of which was in Boca Raton. At all times, Shapiro was Woodbridge's owner, President, and CEO, and maintained control over the company and its affiliates. As witness testimony will demonstrate at sentencing, the net loss caused to investors was over $450 million.

The fraud scheme ran from July 2012, through December 4, 2017, when Woodbridge filed for Chapter 11 bankruptcy and defaulted on its obligations to investors. The scheme was massive in terms of its financial magnitude, duration, and the volume of victims, many of whom are elderly and dispersed across the country – and some of whom will be traveling to Miami for the sentencing.

---

[1]  Co-defendants Roseman and Acevedo have been set for trial in June 2020 (D.E. 162).

[2]  The Government's Response to Shapiro's Objections (D.E. 160) did not purport to be a sentencing memorandum. The instant pleading is the Government's Sentencing Memorandum.

3

For years, Defendant Shapiro and his co-conspirators, including co-defendants Roseman and Acevedo, made material misrepresentations and used high-pressure sales tactics to trick these thousands of victims into investing their funds. Woodbridge claimed, primarily, to offer investors opportunities to make money by helping to fund real estate loans.

Woodbridge mainly promoted two types of products during the scheme: the first position commercial mortgage ("FPCM") and private placement fund offerings ("Fund Offerings"). Regarding the FPCM, Woodbridge promised investors five to eight percent annual interest, paid monthly, with a return of their principal after 12 to 18 months, and assigned each a pro-rata first position interest in the underlying property. Based on Woodbridge's lies and omissions, the victims believed that their money would be used to finance mortgages to third-party property owners, and that third parties would be making interest payments to Woodbridge; they were also made to believe that real estate assets secured their investments, and at minimum, that Woodbridge's real estate dealings would generate the funds used to pay the return on their investments. Misleading marketing materials were disseminated online, as well as to external sales agents, who, instead of acting independently, pitched investors in return for commissions from Woodbridge. The investors were made to believe the investment was very safe, akin to annuities.

With regard to the Fund Offerings, Woodbridge purportedly limited these investments to accredited investors with a $50,000 minimum subscription, and provided for a five-year term with a six to ten percent aggregate annual return paid monthly, and a two percent "accrued preferred dividend." Woodbridge represented to investors that their funds would be used, and their returns would be generated by, real estate acquisitions and investments, notably including Woodbridge's FPCMs. In effect, the Fund Offerings were investments into pooled FPCMs. Shapiro demanded that Roseman and the internal sales team seek to move FPCM investors into the Fund Offerings.

In reality, Woodbridge used investor funds to pay Shapiro and entities he controlled; concealed the fact that Shapiro, not third parties, controlled the vast majority of the properties; concealed the fact that the advertised business models were not profitable; and kept the scheme going with *Ponzi* payments, *i.e.*, by using new investors' money to pay off the old investors. *See* Ex. 10. The investment was risky and not diversified. Shapiro not only disguised his ownership role as to many Woodbridge properties, but also hid his indebtedness to the IRS from investors.

The crime was borne of greed and self-indulgence. As a result of the Woodbridge fraud scheme, Shapiro received approximately $36 million (net) in investor funds, far more than any of his co-conspirators. *See* Ex. 1. He used millions of dollars to, among other things, pay for private air travel throughout the world, including France, Spain, Portugal, Italy, England, Ireland, French Polynesia, Australia, Israel, New Zealand, and Mexico; purchase valuable artwork; purchase high-end jewelry; make payments on luxury vehicles; pay his ex-wife and children; finance homes and home remodeling (a turtle pond, home office, and wine cellar); and to donate to political causes. *Id.* Some of Shapiro's personal expenditures were directly paid for from corporate accounts, while other items were purchased through his wife's credit cards, and then Woodbridge investor funds were used to pay off the credit card debts, as demonstrated by email and bank account records. Shapiro also used accounts held in the name of his wife and his wife's entities to aid him in money laundering and concealing funds from the IRS. In sum, Shapiro poured Woodbridge investors' funds into his multi-account piggybank, and spent Woodbridge investors' funds as if they came from a personal trust fund. *See* Ex. 1-6; 8 hereto (Ex. 1-overall flow of funds/tracing of net $36 million to Shapiro; Ex. 2-tracing of high-end art purchases; Ex. 3-tracing of payments re: Shapiro's luxury home, 4030 Longridge; Ex. 4-tracing of Louis Vuitton and Jimmy Choo purchases; Ex. 5-tracing of gold coin expenditures; Ex. 6-tracing of jewelry expenditures; Ex. 8-tracing of wine).

Shapiro went to great lengths to keep the fraud – and his profits – going, even in the face of hurdles such as regulatory and enforcement actions. Shapiro violated an emergency cease-and-desist order issued by the Securities Commissioner for the State of Texas by (1) offering to make "under-the-table" payments in untraceable gold coins to salespeople who agreed to continue soliciting investors regardless of the cease-and-desist order; and (2) arranging for certain salespeople to receive investor money through intermediary Regulation D corporations instead of having investor money sent directly to Woodbridge.

Furthermore, it was not just in Texas that Woodbridge had been ordered to halt its activities. During the course of the conspiracy, at least five states, including Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, issued cease and desist orders against one or more of the Woodbridge entities based on their unregistered sale of securities. Shapiro and his co-conspirators nonetheless continued to sell their investment products to residents of those states, and engaged in deceptive conduct with respect to pending state regulatory actions against Woodbridge. Shapiro instructed Roseman to affirmatively withhold Woodbridge's state regulatory problems from investors, and to only tell investors in the event that they ask. Furthermore, Shapiro, Roseman, and their co-conspirators mischaracterized the dispositions of these regulatory actions to the external sales agents, who assisted Woodbridge in pushing its business to investors, and the investors themselves, by claiming that Woodbridge had been "exonerated" of wrongdoing by the states, when no such determination was actually made.

Towards the end of the conspiracy, Shapiro, Roseman, and their co-conspirators began transitioning investors into a new Woodbridge product called a Co-Lending Opportunity ("CLO"). The CLO mirrored the FPCM in every material respect save one—the CLO's term was for nine months. This was an apparent effort to avoid having to market the CLO as a security. In

email communications, Shapiro and Roseman contended that Woodbridge could circumvent some states' regulatory agencies by moving investors from the FPCM and Fund Offerings to the CLO, and planned to switch first, then settle quietly, with the states that issued cease and desist orders.

Beginning in the summer of 2017, Shapiro began exploring the possibility of filing for bankruptcy. However, Shapiro and his co-conspirators continued advertising investments for FPCM, Fund Offerings and CLOs through all mediums, and continued to accept investor money without disclosing that Woodbridge was insolvent and on the verge of bankruptcy. Woodbridge received more than $52 million of investor money from October 2017 through the filing of its bankruptcy on December 4, 2017.[3] Indeed, fundraising ballooned in Woodbridge's later years, though financial analysis demonstrates that the *Ponzi* scheme began very early on. *See* Ex. 10.

The SEC conducted a parallel investigation and, in December 2017, filed an emergency action for relief, shortly after Woodbridge declared bankruptcy. In the SEC matter, District Court Judge Marcia G. Cooke issued an asset freeze order directed at Shapiro and his associates ordering them to stop using investor money. *See United States v. Shapiro, et al.*, Case No. 1:17-CV-24624-MGC, Order Granting Emergency *Ex Parte* Motion for Asset Freeze and Other Relief (D.E. 13) (S.D. Fla. Dec. 20, 2017). In addition, immediately prior to the asset freeze and Woodbridge's bankruptcy filing (from ~April 2017 to November 2017), Shapiro diverted millions of dollars to several bank accounts opened in the name of his wife. Employee interviews and financial analysis revealed that Shapiro used this money – which consisted of funds traceable to Woodbridge's

---

[3] Employee interviews and emails obtained during the investigation revealed that there were canaries in the coalmine internally, and that troubles became especially apparent after the Owlwood Estate refinancing; however, the support staff and lower-level salespersons were still kept in the dark regarding Shapiro's bankruptcy plans. This was of a piece with how Shapiro had designed Woodbridge as a compartmentalized business, with persons in different physical locations and departments working as spokes under his and his co-conspirators' control.

7

victim investors – to fund new business ventures, including companies called "Commercial Bridge Lenders, LLC" and "Lionshare Lending, LLC," for his continued benefit. *See* Ex. 7.

In particular, on April 30, 2018 – *months after* the bankruptcy and SEC asset freeze – one of Jeri Shapiro's many accounts, containing funds 100% traceable to Woodbridge victims, transferred $140,000 to Commercial Bridge Loan, LLC's Regions Bank account ending in 8628. *See* Ex. 7 (tracing of certain Woodbridge investor-derived funds, pre-and post-bankruptcy). About two weeks later, on May 12, 2018, another one of the entities under Jeri Shapiro's name, Schwartz Media Buying Co. LLC, cut a $1.2 million check to Commercial Bridge Loan, LLC – again funded by money traceable to Woodbridge victims. *Id.* Thereafter, between in or around September 2018 and January 2019, the Commercial Bridge Loan, LLC account funneled approximately $174,000 back to another account opened in the name of Jeri Shapiro. *Id.* That Shapiro's wife would perform these transactions without her husband's knowledge would be fundamentally at odds with the scheme's operation, his admissions (D.E. 140 at 6-7), and the great weight of the evidence.

Shapiro's asset concealment and diversion did not even end with his arrest in April 2019. The investigation more recently revealed that, days after his arrest in this case, Shapiro's wife opened and accessed storage facilities containing valuables funded by victims' money. While, in accordance with the terms of his plea agreement, after his guilty plea, Defendant's counsel ultimately – and commendably – disclosed to the United States the location and existence of a storage unit in California, investigation of the storage facility's access records revealed that the unit was first leased just after Defendant's arrest, by his wife. When law enforcement later responded to search the unit, they discovered a Mark Chagall painting and more than $250,000 in gold coins inside. Financial tracing analysis revealed that the Chagall painting was purchased with Woodbridge investor funds during the conspiracy (*see* Ex. 2). Regarding the gold coins, while

8

approximately $250,000 worth of gold coins were found in Shapiro's storage unit, tracing analysis revealed that Woodbridge funds were used to purchase approximately $920,199 in gold coins between July 2012 and June 2016 (Ex. 5). As described above, some gold coins were used to pay co-conspirators as, essentially, bribes in return for assistance with evading regulators, but even so; that leaves hundreds of thousands of dollars' worth of gold coins outstanding, unaccounted for to this day. It is unknowable to what extent Shapiro depleted assets held in the storage facility or elsewhere prior to his decision to plead guilty, either by himself or with his wife's assistance. It is clear, however, that Shapiro's wife obtained and stored assets at this facility after his arrest, which took place well after the SEC asset freeze and bankruptcy. It is also clear that the assets stored in this facility were purchased with Woodbridge investor funds. *See* Ex. 2, Ex. 5.

    b. **Shapiro's Tax Evasion**

While the Woodbridge fraud, money laundering, and *Ponzi* schemes spanned five more recent years, Shapiro's criminal conduct spanned decades. Shapiro pled guilty to willfully attempting to evade and defeat payment of income tax due and owing to the United States for calendar (tax) years 2000 through 2005, with total tax due and owing in excess of six million dollars, as charged in Count 10 of the Indictment. Shapiro's evasion began in or around January 2002 and continued through 2019. He did so by, among other means: (a) filing false and fraudulent individual income tax returns (IRS Form 1040s), in which he understated his income; (b) creating RS Trust in the State of Nevada on or about June 25, 2013, to conceal his assets and income; (c) transferring approximately $60,537,176 from RS Trust to nominee accounts controlled by him; (d) creating and using nominee accounts to pay personal expenses totaling approximately $36 million (net) (*see* Ex. 1), including the purchase and renovation of his home, luxury airline travel, wine, entertainment, luxury vehicles, and jewelry; and (e) filing a false and fraudulent IRS Form 656-L,

9

"Offer in Compromise (Doubt As To Liability)," with the IRS in Plantation Florida, on or about March 13, 2017, wherein he lied about his physical home address on the signed form under penalty of perjury, and claimed to live at a location worth substantially less than the approximately $6.7 million dollar property in which he resided. *See* Ex. 3 (4030 Longridge tracing); Ex. 9 (photos).

Shapiro's income tax returns for 2000 through 2005 failed to accurately disclose his income. He significantly underreported income, and for tax years 2001 through 2003, showed $0 in taxes due and owing. Over the years, Shapiro also attempted to contest the amounts that he owed through civil tax litigation, but did not prevail. In particular, Shapiro previously argued that he should not have to pay tax penalties or interest on amounts due and owing, and that he should receive an abatement: (1) because of statute of limitations arguments as to tax years 2000 through 2002; and (2) because of his medical condition, specifically, suffering and then recovering from cancer (Hodgkin's Lymphoma) for tax years 2003 to 2005. That request did not succeed, and as a matter of logic, the argument he advanced regarding his cancer preventing payment did not make much sense – as his physical conditions did not seem to inhibit him in any way from taking in and concealing money during that time period, but he claimed they justified his failure to pay the IRS.

In 2008, the IRS issued a summons and filed tax liens. Shapiro, through his attorneys, mounted challenges to the IRS's collection efforts, including by filing multiple petitions in United States Tax Court from 2008 through 2010, and submitting requests to the IRS for settlement offers. Even in this part of the process, Shapiro misrepresented or failed to accurately disclose assets and income. For example, in 2010, Shapiro's power of attorney provided an unsigned Form 433-A (Collection Information Statement) as part of a collection due process request. Yet, Shapiro did not report properties, investments, or cars on the form, and ultimately, his representative told the IRS that Shapiro was unwilling to turn over signed financial disclosures.

Despite his knowledge of his outstanding tax liability, Shapiro continued to evade payment of the taxes due and owing by creating the RS Protection Trust in 2013; shielding assets; and including misleading or false information, or declining to report financial information, to the IRS. Ultimately, the IRS placed a lien on his $6.7 million home, 4030 Longridge, in 2017, and Shapiro offered to settle with the IRS; but the settlement fell apart when again, Shapiro refused to complete a Form 433-A which called for complete disclosure of his assets and finances.

Shapiro has now in part corrected what he had reported, and paid some penalties; yet, even considering reporting and payments for more recent tax years up to 2016, as of September 23, 2019, he still owed more than approximately $3.6 million (PSR Addendum, D.E. 164-1 at 6).

### III. GUIDELINES CALCULATIONS IN SHAPIRO'S PSR

The PSR (D.E. 164) calculates Shapiro's base offense level as 7, pursuant to U.S.S.G. § 2B1.1(a)(1) (PSR ¶ 120). Twenty-eight (28) levels are added, pursuant to § 2B1.1(b)(1)(O), because a reasonable and conservative estimate of loss caused is approximately $485 million (PSR ¶ 121). Six (6) additional levels are added because the offense involved mass marketing and resulted in a substantial financial hardship to 25 or more victims, pursuant to § 2B1.1(b)(2)(C) (PSR ¶ 122). Two (2) additional levels are added pursuant to § 2B1.1(b)(9)(C) because Shapiro violated a prior, specific administrative or judicial order (PSR ¶ 123). Two additional levels are added pursuant to § 2B1.1(b)(10)(C) because the defendant's conduct constituted sophisticated means (PSR ¶ 124). Probation also recommended application of a four-level enhancement for Shapiro's role as an organizer or leader, pursuant to § 3B1.1(a) (PSR ¶ 127); a two-level enhancement because he knew, or should have known, the offense targeted vulnerable victims, in accordance with § 3A1.1(b)(1) (PSR ¶ 125); and an additional two-level enhancement for the large number of vulnerable victims (the elderly), per § 3A1.1(b)(2) (PSR ¶ 126). As Probation

determined that Shapiro has clearly accepted responsibility for his criminal conduct, and that acceptance was timely (PSR ¶¶ 142-143), and that, based upon the grouping rules, the conspiracy offense has a guidelines estimate in excess of the tax offense, in sum, Shapiro's combined adjusted offense level, according to the PSR, is 53 (PSR ¶ 140) – and the total offense level is 43 (PSR ¶ 144). That would correspond to life based upon the sentencing table. However, as the advisory range is in excess of the statutory maximum based on the plea agreement, which is 25 years' imprisonment, the recommended guidelines range is 300 months' imprisonment (PSR ¶ 188).

### IV. 25 YEARS' IMPRISONMENT IS WARRANTED BASED ON THE § 3553(a) FACTORS AND THE SPECIFIC CIRCUMSTANCES OF THIS CASE.

#### a. The seriousness of the conduct and the need to promote respect for the law:

Shapiro's crime is in the category of the most serious financial crimes a person can commit. Shapiro engaged in a complicated, self-serving fraud that targeted elderly investors, in devastating and prolonged fashion. Both its duration and complexity are notable, even when compared to other financial crimes and *Ponzi* schemes. Shapiro recruited others into his ever-expanding scheme, and, for the purpose of making his own retirement more extravagant, stole the life savings of others, forcing some to go back to work in order to recoup their investments. Shapiro's tax evasion – which spanned decades and clearly animated his choices to place his shell companies and assets in his wife's name – provides additional reason to fashion a sentence that will promote respect for the law. Another facet of his crimes revealing a strong need to sentence him to a substantial term of imprisonment is the fact that Shapiro repeatedly circumvented, and enlisted others to help him circumvent, multiple orders from state securities regulators; the SEC's asset freeze; and the bankruptcy proceeding that he caused in the first place, by operating a massive fraud and *Ponzi* scheme through Woodbridge. *See* Ex. 7. Nor did his obstructive behavior and asset depletion cease with his arrest. Accordingly, the guidelines accurately reflect the seriousness

of Shapiro's egregious conduct. Indeed, because of the parties' negotiated plea agreement, a sentence of the statutory maximum of 25 years' imprisonment is below what the guidelines would ordinarily recommend for a crime of this magnitude and seriousness: level 43, life imprisonment.

### b. **The need to avoid unwarranted disparities with similarly situated offenders:**

A Guidelines sentence is necessary to avoid unwarranted disparities with defendants who have committed crimes of similar scope. While Shapiro has submitted a table of sentences from other matters, the United States has amassed its own collection of cases which bear greater similarities to the facts of this case, and they tend to show that, based on the scope of Shapiro's fraud and the number of victims, even considering his age, a 25-year sentence is, if anything, on the lower end of the spectrum. The Government respectfully requests the Court to consider:

- *United States v. Edwin Fujinaga*, No. 2:15-cr-00198-GMN-NJK (D. Nev. June 17, 2019) (D.E. 338) (following trial, sentencing 72 year-old defendant to 50 years' imprisonment for his role in spearheading a fraud and $1.12 billion *Ponzi* scheme, which involved approximately 10,000 Japanese victims).

- *United States v. Norman Schmidt*, 594 F.3d 1270, 1272 (10th Cir. 2010) (sentence of 330 months for 72 year-old defendant who orchestrated *Ponzi* scheme with investor losses of approximately $40 million deemed reasonable; defendant was sentenced post-trial).

- *United States v. Arthur Lamar Adams*, No. 3:18-cr-00088-CWR-LRA (S.D. Miss. Nov. 8, 2018) (D.E. 21) (sentencing 58 year-old organizer and leader of approximately $165 million Ponzi scheme, involving approximately 200-300 investor victims, to 27 years' (325 months') imprisonment following entry of guilty plea).

- *United States v. Kevin Merrill*, No. 1:18-cr-00465-RDB-1 (D. Md. Oct. 11, 2019) (D.E. 146) (sentencing 54 year-old organizer/leader of estimated $396 million *Ponzi* and fraud scheme to 22 years' (240 months') imprisonment, following entry of plea agreement; defendant's wife was also involved, and unlike here, she was also charged and convicted).

- *United States v. Antonio Carlos De Godoy Buzaneli*, No. 0:17-cr-00284-MJD-HB (D. Minn. Apr. 10, 2019) (D.E. 132) (following guilty plea, sentencing 57 year-old defendant, who was also a South Floridian, and who spearheaded an approximately $150 million *Ponzi* and investment fraud scheme involving Brazilian factoring, to 20 years' (240 months') imprisonment, and to pay restitution of approximately $51 million).

13

- *United States v. Raymond Montoya*, No. 18-10225-GAO (D. Mass. Mar. 25, 2019) (D.E. 44-46) (sentencing 70 year-old defendant who spearheaded $38 million *Ponzi* scheme to 175 months' imprisonment following plea, where guidelines range was 210-262 months).

- *United States v. Lee Loomis*, No. 12-cr-00315-JAM (E.D. Cal. Oct. 5, 2018) (D.E. 699) (following guilty plea, sentencing 60 year-old defendant who spearheaded approximately $10 million *Ponzi* scheme to 12 years' (144 months') imprisonment, in case involving approximately 183 investor victims).

In formulating its sentencing recommendation, the United States has also considered sentences imposed in the following white collar cases in this District, some of which involved less serious conduct, in terms of duration and victim impact, as compared to the conduct at issue here:

- *United States v. Leonard Bogdan*, No. 05-14090-CR-Martinez (S.D. Fla.) (sentence of 360 months involving investment fraud with approximately 191 victims and loss of approximately $11.5 million).

- *United States v. Darryl Burke*, No. 13-20616-CR-Cohn (S.D. Fla.) (sentence of 360 months in connection with bank fraud involving more than $7 million in losses for numerous fraudulent mortgages).

- *United States v. Domenico Rabuffo*, No. 14-20008-CR-Moore (S.D. Fla.) (sentence of 327 months in connection with bank fraud involving more than $27 million in losses for numerous fraudulent mortgages and approximately 50 victims).

- *United States v. Monte Grow*, No. 16-CR-20893-FAM (S.D. Fla.) (sentence of 262 months for pharmacy fraud involving $39 million loss to Medicare).

- *United States v. Serge Francois*, No. 16-20399-CR-Gayles (S.D. Fla.) (sentence of 204 months for owner of pharmacy involving $30 million fraud loss).

- *United States v. Jose Carlos Morales*, No. 12-20644-CR-Lenard (S.D. Fla.) (sentence of 144 months for owner of pharmacy who pleaded guilty to health care fraud involving a loss of $23 million).

Here, the victims were largely elderly retirees, not sophisticated investors, setting this case apart from many investment frauds, and the victims numbered in the thousands, not hundreds. Furthermore, when considering his tax crimes, Shapiro's conduct is more serious than many of these cases because he chose to commit these crimes over the course of nearly two decades.

14

c. **The need for specific and general deterrence:**

The Eleventh Circuit has explicitly emphasized the significance of "general deterrence . . . in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308-09 (11th Cir. 2014); *see also, e.g.*, *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th Cir. 2013) (vacating, as substantively unreasonable, sentence of time served, which represented a 57-month downward variance, for defendant responsible for $3 million health care fraud scheme, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and that "[w]e are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence."), *cert. denied*, 134 S. Ct. 140, 187 L. Ed. 2d 38 (2013). Although Shapiro has no criminal history, estimates suggest that more than seventy percent of fraud offenders, which includes the vast majority of white collar offenders, have little or no criminal history. *See* Selected Sentencing, Guideline Application, and Demographic Information for § 2B1.1 Offenders, Fiscal Year 2012, U.S. SENT'G COMM'N (Sept. 18, 2013).

This suggests a particular need to deter those in the community who lead superficially law-abiding lives, and have no notable prior convictions, but, like Shapiro, commit fraud for years, without getting caught. Moreover, courts have also found that, in the context of white collar crime, positive employment history is no mitigating factor, particularly where, as here, the employment history enabled and/or served as the vehicle for the offenses of conviction. *See, e.g.*, *United States v. Whitehead*, 559 F.3d 918, 921 (9th Cir. 2009) (Gould, K., dissenting from denial of rehearing *en banc*) ("We can hardly be surprised if a white collar criminal has a good employment history – otherwise, he or she would likely not be in a position to commit the crime.").

As demonstrated by the cases cited above, many *Ponzi* and financial fraud scheme leaders start committing these crimes at even more advanced ages than Shapiro (in their seventies).

Though it is appropriate for the Court to consider the complete picture of who the defendant is, including his age, here, Shapiro's age and medical history perhaps makes him the type of person who may have been, at the time he chose to commit these crimes, even more acutely aware than younger defendants as to how financial losses may impact a retiree's life. And yet, he chose to essentially rob hardworking Americans all the same, despite having lived the decades he did.

## V. SHAPIRO'S SENTENCING MEMORANDUM FAILS TO JUSTIFY A VARIANCE OR DOWNWARD DEPARTURE OF 50%, OR TO ANY DEGREE.

### a. Shapiro's Age and Medical Conditions Fail to Justify Variance or Departure.

Contrary to what Shapiro suggests, his condition is not so unusual or extreme that the Bureau of Prisons cannot handle his care. The Bureau of Prisons is equipped to address a wide range of health and medical conditions, and courts have affirmed decisions not to vary downward in cases in which defendants have faced significantly worse afflictions. *See*, *e.g.*, *United States v. Dao*, 424 F. App'x 576, 577-80 (8th Cir. 2011) (affirming denial of variance downward from 144-month sentence in fraud case, in which defendant suffered from polio, post-polio syndrome, spinal stenosis, neck and back problems, migraines, headaches, and severe psoriasis, and would require assistance with everyday life activities); *United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) (affirming 144-month sentence of 72 year-old Dr. Kushner, who was also sentenced to pay approximately $9.3 million in restitution for multi-year health care fraud scheme).

Federal courts have consistently recognized the propriety of incarcerating even defendants with severe physical disabilities. *See United States v. Cobler*, 748 F.3d 570, 574 (4th Cir. 2014) (affirming sentencing court's determination that there was "no reason to vary from the guidelines" in case where defendant had grave medical condition); *United States v. Hankerson*, 491 F. App'x 166, 168 (11th Cir. 2012) (360-month sentence for disabled, HIV-positive defendant was appropriate in light of his criminal history and the severity of his offense); *United States v. Sanchez*,

381 F. App'x 917 (11th Cir.) (affirming denial of variance on ground that health care fraud defendant suffered from total blindness, diabetes, and kidney disease), *cert. denied*, 131 S. Ct. 302 (2010); *United States v. Fetterhof*, 328 F. App'x 781, 783 (3d Cir. 2009) (affirming denial of variance for defendant who suffered from diabetes, fibromyalgia, stage two liver disease, a cardiac condition, cervical back pain, depression and anxiety).

All of these cases – indeed, as well as the cases cited by Shapiro – underscore the basic premise of what all parties anticipate will happen here, as it is fundamental to sentencing proceedings: the Court will consider the particular facts of this case and these crimes; the personal background and history of this particular Defendant; and the relevant statutory factors. And here, it is extremely notable that the Defendant claims, as he did years ago to the IRS, that his medical conditions should translate into more lenient punishment, yet these same factors – his medical condition and age – were present in spades during the years in which he designed and executed a complex fraud, through which he victimized thousands of others.

Moreover, at 62, Shapiro is not on the older end of the spectrum for *Ponzi* schemers; many financial fraudsters commit crimes into their seventies, with similar backgrounds and for the same motive as Shapiro: greed. *See* pp. 13-14, *supra*. In addition, Shapiro's wife, Jeri Shapiro, was given a non-prosecution agreement by the U.S. Attorney's Office in exchange for her husband's guilty plea, which is a significant benefit to him as well as her, not accounted for in the guidelines. Accordingly, there is no legal or persuasive basis on which to grant Shapiro the 50% sentence reduction he seeks, or any variance or departure below 25 years' imprisonment.

### b. **Shapiro's Sentencing Guidelines-Based Arguments Are Unpersuasive.**

Shapiro devotes much of his sentencing memorandum to contesting the sentencing guidelines paradigm as overly harsh, based upon the 2B1.1 table as well as multiple enhancements.

Here, however, those factors are not driving the guidelines range, because the parties' negotiated plea agreement capped Shapiro's possible sentence well below the advisory guidelines range that would apply based upon the attributes of the 2B1.1 loss table and the other 2B enhancements about which he complains. Indeed, based upon the specific features of his crimes, Shapiro's guidelines range would be life imprisonment – level 43 – but for the parties' plea agreement. As such, the plea offer already includes an approximately 17% variance down from what the guidelines would normally dictate for his offense conduct. For the reasons stated above, granting a further reduction of Shapiro's sentence from 300 months to 150 months, as Shapiro advocates, would border on, if not amount to, a substantively unreasonable sentence.

Finally, while Shapiro implies, for example, that it would work an injustice to sentence him to a term of imprisonment akin to what an aircraft pirate may receive, the United States Sentencing Commission and Congress considered these very issues when determining appropriate punishment ranges and statutory penalties for white collar crimes. Unlike a rash or violent decision borne of drunkenness, sociopathy, mental instability, a brief lapse in judgment, or abject despair, Shapiro's crimes were of his own conscious making, day in, day out, for years on end, and at times their only limiting factor was his creativity. This scheme is markedly different in design and purpose in a way that makes it just as serious, if not more serious, than many crimes for which courts may impose 25 year sentences. For the years his crimes continued, Shapiro did not appear to think one bit about anything other than his personal bottom line; he appears to have chosen to devote more time and attention to paying credit card bills for his wife's hundreds of designer shoes and purses, and his own cars and hundreds of bottles of wine, than he did to following multiple courts' orders, and his pattern of depletion of victim investor funds continued after a bankruptcy that he filed; after an asset freeze order that named him personally; and through his arrest in April 2019.

## **CONCLUSION**

For the foregoing reasons, the United States requests that the Court sentence Shapiro to 25 years' imprisonment, in accordance with the advisory guidelines range, and to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.  This will provide sufficient, but not greater than necessary, punishment, based on the totality of the circumstances.

The United States also requests that a final order of forfeiture be imposed; that the Court pronounce forfeiture as part of the sentence; and, that the Court schedule a restitution hearing to take place approximately 60 days from the date of the sentencing hearing, if needed.

       Respectfully submitted,

       ARIANA FAJARDO ORSHAN
       UNITED STATES ATTORNEY

By: */s/ Lisa H. Miller*
    LISA H. MILLER
    Court ID No. A5502054
    ROGER CRUZ
    Assistant United States Attorneys
    United States Attorney's Office
    99 NE 4th Street
    Miami, Florida 33132
    Tel: (305) 961-9312
    Email:  Lisa.Miller@usdoj.gov